UNITED STATES, Appellee,

v.

Sergeant David N. SEELOFF, SSN
097–48–4347, United States
Army, Appellant.

CM 441172.

U. S. Army Court of Military Review.

31 March 1983.

Captain Chuck R. Pardue, JAGC, argued the cause for the appellant. With him on the brief were Colonel Edward S. Adamkewicz, Jr, JAGC, Major Raymond C. Ruppert, JAGC, Major Robert C. Rhodes, JAGC, and Captain Peter R. Huntsman, JAGC.

Captain Mark S. Julius, JAGC, argued the cause for the appellee. With him on the brief were Colonel R.R. Boller, JAGC, Lieutenant Colonel John T. Edwards, JAGC, Major Michael R. Smythers, JAGC, and Major John T. Meixell, JAGC.

Before FULTON, CLAUSE and COHEN, Appellate Military Judges.

## OPINION OF THE COURT

COHEN, Judge:

Sergeant Seeloff, the appellant, was convicted of premeditated murder and soliciting another to assist in an escape from confinement, violations of Articles 118 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 918 and 934 (1976). He was sentenced to a dishonorable discharge, total forfeitures, confinement for life and reduction to Private E–1. The convening authority approved the adjudged sentence.

## FACTS

Sergeant Seeloff and Sergeant Heffren began drinking German beer at approximately 1200–1300 hours, 13 October 1980, in their room and continued until about 1930 hours. During this time Sergeant Seeloff drank about ten beers. The victim, a female noncommissioned officer, joined them during this period of time and drank with them. At approximately 1930 hours, the three went to the NCO Club where they continued drinking. Sergeant Heffren left because he was drunk. Sergeant Thrash joined Sergeant Seeloff and the victim for about a half-hour during which Sergeant Seeloff consumed three more beers. Sergeant Thrash saw Sergeant Seeloff and the

victim leave the club together. He observed they were acting friendly toward each other.

Then, according to Sergeant Seeloff's statement, he and the victim went to his room and had sexual intercourse. He had an orgasm but the victim did not. The victim wanted to continue but Sergeant Seeloff was unable and unwilling. The victim then attempted to orally sodomize him but he objected. The victim said, "You are just like a nigger. You are a nigger." Sergeant Seeloff grabbed her by the throat and began strangling her. After awhile his hands became tired and he let go. The victim was not dead and tried to push him away. He grabbed her by the throat and continued strangling her until she was dead. During the strangulation the victim defecated and urinated on the bed.

At approximately 2130 hours, Sergeant Seeloff left his room and went to the Charge of Quarters (CQ) desk. He called Specialist Five Spencer, the CQ, aside and told him that he had a big surprise for Spencer in about thirty minutes. During this conversation, Spencer did not notice any signs of intoxication.

At 2225 hours, Sergeant Seeloff walked into the military police station and stated to Sergeant Shirvinski, the desk sergeant, "I have a personal problem. I have to talk to somebody. I just murdered someone." Sergeant Shirvinski did not notice signs of intoxication, but did note that Sergeant Seeloff appeared calm. He had not received any reports of violent crime. Sergeant Shirvinski told his desk clerk, Private First Class Edkin, to take Sergeant Seeloff to the Report Room and see if he could render any assistance.

Private First Class Edkin took Sergeant Seeloff across the room to the Report Room. Upon entering, Private First Class Edkin asked Sergeant Seeloff for his identification (ID) card and where the body was. Sergeant Seeloff gave Edkin his ID card and told him the location of the body. Edkin returned to Sergeant Shirvinski and told him what Sergeant Seeloff said. Sergeant Shirvinski dispatched a patrol by radio and Private First Class Edkin returned to the Report Room. Private First Class Edkin did not read Sergeant Seeloff his rights and, except for the initial question concerning the location of the body, did not ask him any questions. Edkin just sat there taking notes as fast as he could as Sergeant Seeloff talked.[1] During his monologue, Sergeant Seeloff asked for a military attorney, but continued talking. Edkin told Sergeant Seeloff several times not to say anything until agents of the military police (MP) or Criminal Investigation Command (CID) arrived. When the patrol verified that a body had been found, Sergeant Shirvinski had Sergeant Seeloff placed under apprehension and removed to the detention cell (D-cell).

At 2315 hours, Private First Class Johnson and Specialist Four Childers went to the D-cell to inventory Sergeant Seeloff's personal belongings. They were instructed not to question him. Johnson advised Sergeant Seeloff as to his Article 31 rights. He did not question him. Sergeant Seeloff acknowledged that he understood his rights. Sergeant Seeloff gratuitously stated that he "should have taken a shower before coming there because he still had the smell of the bitch on him." The military policemen offered no comment in response. Both Childers and Johnson did not consider Sergeant Seeloff to be intoxicated.

At 0030 hours, 14 October 1980, Sergeant Seeloff was taken to the CID office where he was informed of his rights by Special Agent Boatwright including advice that he did not have to waive his rights because he had made prior statements. Sergeant Seeloff waived his rights and made a full statement.

Private First Class Edkin testified that at the time he asked Sergeant Seeloff where the body was, he did not suspect Sergeant Seeloff of an offense and only considered him to be one of the "weird" people one meets when working at the desk in the MP station. It was during the course of Ser-

---

1. Private First Class Edkin's notes are attached as an appendix to this opinion.

geant Seeloff's monologue that Edkin began to suspect that he was serious. At that point, Edkin requested several other military policemen to stand by in the event he might require assistance. When the body was discovered, Private First Class Edkin ·became convinced that what Sergeant Seeloff had been telling him was true. Private First Class Edkin never told anyone about Sergeant Seeloff's request for a lawyer, although he did write it down in his notes. Special Agent Boatwright stated that he was unaware of this request until after he had completed his interrogation.

## MOTION TO SUPPRESS STATEMENTS

Sergeant Seeloff's incriminating statements will be analyzed chronologically beginning with his statement to the CQ and his comments to Sergeant Shirvinski upon entering the military police station. These statements are not under attack, but are considered indicative of Sergeant Seeloff's eagerness to tell others what he had done. The first critical statements asked to be suppressed are the responses to Private First Class Edkin's request for Sergeant Seeloff's identification card and for the location of the body.

■ A request for identification does not require a prior warning. A statement of one's name is not " 'regarding' any offense, is not an element of the offense and does not tend to prove a crime." *United States v. Davenport,* 9 M.J. 364, 369 (C.M.A.1980). The "disclosure of [one's] name and address is essentially a neutral act." *California v. Byers,* 402 U.S. 424, 432, 91 S.Ct. 1535, 1540, 29 L.Ed.2d 9, 19 (1971). Under the circumstances of this case it was not a statement within the meaning of Article 31(b), Uniform Code of Military Justice, 10 U.S.C. § 831(b) (1976).

■ With respect to the inquiry regarding the location of the body we likewise find that Sergeant Seeloff was not entitled to a warning. Article 31 and *Miranda*[2] warnings are required when the police, or other officials, desire to question a suspect.

We are convinced that neither Sergeant Shirvinski nor Private First Class Edkin considered Sergeant Seeloff as a "suspect" at the time the question was asked. Both so testified, and their conduct at the time indicates their lack of suspicion. Private First Class Edkin was directed to see if he could assist Sergeant Seeloff with "his problem" because Sergeant Shirvinski was busy with administrative matters. It is hard to imagine that a seasoned military police noncommissioned officer would send an inexperienced and unarmed assistant alone into a room with a physically larger soldier suspected of recently committing murder. Had Sergeant Shirvinski suspected Sergeant Seeloff, we have no doubt in concluding that he would have apprehended him immediately. Likewise, had Private First Class Edkin suspected Sergeant Seeloff of the offense we may assume he would have taken measures to protect himself, as he later did when, during the course of Sergeant Seeloff's monologue, he began to suspect Sergeant Seeloff was something more than a practical joker.

Our inquiry may not stop here. We must also be satisfied that Shirvinski's and Edkin's lack of suspicion was objectively reasonable. *United States v. Anglin,* 18 U.S.C.M.A. 520, 40 C.M.R. 232 (1969). Under the circumstances of Sergeant Seeloff's appearance at the military police station, we so find. There had been no report of any violent crime. Sergeant Seeloff calmly, of his own volition, walked into the military police station and prefaced his incriminatory statement by asking to discuss a "personal problem." It was not unusual for people to come into the station wanting to discuss personal problems not associated with criminal activity, nor were officers on duty at the desk unused to encountering "weird people" who might presumably make a statement similar to that made by Sergeant Seeloff when he entered the station without in fact having committed any offense. The failure of Sergeant Seeloff's initial declaration to engender suspicion among the personnel present was not unreasonable.

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1965).

We find that Sergeant Seeloff was not in custody when Private First Class Edkin simultaneously asked for his identification and the location of the victim. The two soldiers were in a quiet administrative area which both understood to be for the purpose of trying to assist Sergeant Seeloff with his "personal problem." The inquiry as to the location of the body was properly asked as a preliminary question to ascertain if Sergeant Seeloff was fabricating a story. The answer to this question would have directed the nature of assistance that might have been afforded to him. Likewise, although Private First Class Edkin did not initially believe that Sergeant Seeloff had murdered someone, he felt he needed to get this information in the event there was someone thought to be dead, but who was only injured and in need of help. The question was not designed to induce an admission regarding a suspected offense. See *United States v. Morris,* 1 M.J. 352 (C.M.A.1976). Rather, it is analogous to those fact-finding, general information questions asked at the scene of a crime or during the initial stages of an investigation. The failure of a police officer to make a preliminary inquiry into a claim that one has just committed a murder, although there is no reasonable basis to suspect the truth of the claim, would be a serious breach of a policeman's duty. Sergeant Seeloff at this time was not a suspect and was not in custody, and was therefore not required to be given either an Article 31 or *Miranda* warning.

■ We turn now to the statements of Sergeant Seeloff made to Private First Class Edkin after Edkin had reported the alleged location of a victim to the desk sergeant and returned to the report room. We are convinced, as was the military judge who saw and heard the witness, that Private First Class Edkin did not interrogate Sergeant Seeloff after asking the two preliminary questions. The notes taken by Private First Class Edkin clearly indicate an active volunteering, if not compulsion, on the part of Sergeant Seeloff to tell what he did. During his monologue, Sergeant Seeloff described in detail how the murder was committed, his lack of remorse and his future plans. If anything, the notes tend to show that it was the appellant who was questioning Private First Class Edkin and trying to engage him in conversation. "There is no requirement that police stop a person who enters a police station and states he wishes to confess to a crime . . . . Volunteered statements of any kind are not barred by the Fifth Amendment." *Miranda,* 384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.

### WAIVER OF COUNSEL

Sergeant Seeloff claims that his sixth amendment rights were violated by taking his statement after ignoring his request for counsel. *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). While in the report room at a time after he disclosed the location of the victim but before discovery of the body, Sergeant Seeloff began telling Private First Class Edkin how the crime was committed without being questioned. He continued to make incriminating statements despite being told by Private First Class Edkin several times to be quiet. At a point in Sergeant Seeloff's monologue he stated he wanted a military lawyer. Private First Class Edkin's notes reflect that this statement was made in a manner that could hardly be understood to indicate that Sergeant Seeloff wanted to deal with the police only through counsel.

> I all ready [sic] know my rights. I all ready [sic] omitted [sic] to everything. I want a military lawer [sic]. I'm cool and everything, you look nervous.

Private First Class Edkin replied that he was not and Sergeant Seeloff continued his monologue. No dialogue was initiated by Private First Class Edkin. Rather, it was the loquaciousness of Sergeant Seeloff that operated to his detriment. His propensity to talk was again manifested when he was taken to the detention cell. There, while being advised of his rights Sergeant Seeloff attempted to interrupt Private First Class Johnson and had to be told to remain silent until the rights advisement was completed. Sergeant Seeloff acknowledged not only

that he understood his rights, but stated unequivocally that he did not want a lawyer at that time. He again made incriminating comments without being questioned. About an hour later he was transported to the CID office. There he received another complete advisement of his rights. Once more Sergeant Seeloff acknowledged his understanding of his rights and stated that he did not want a lawyer and was willing to discuss what had happened with the police investigators.

■ Under the circumstances of this case even if we construed Seeloff's statement to Private First Class Edkin that he wanted a military lawyer to mean that he wanted to deal with the police only through a lawyer, as distinguished from only a manifestation that he intended to be represented by a military rather than civilian attorney, it would have no effect on the admissibility of the statements made to Private First Class Edkin. No interrogation was being conducted nor had Private First Class Edkin initiated a conversation. Likewise, Sergeant Seeloff's gratuitous comments while in the D-cell were not the product of questioning and they were not inadmissible on the basis of any violation of an accused's rights to counsel. As to his formal statement to the CID, we also find that it was admissible. Sergeant Seeloff was properly advised of his rights by the investigator and acknowledged his understanding. At that time he was also told by Agent Boatwright:

Okay, and one thing further that I need you to understand, I need you to understand that nothing you have said previously to the MP's or anyone else can compel you to waive your rights. You have to understand that before we can proceed.

Sergeant Seeloff replied, "I understand it, just because I've talked to the MP's, I don't have to waive my rights."

■ We find that appellant did not attempt or intend to invoke his rights to counsel at anytime and that his statements to various military policemen were the products of voluntary and conscious decisions made by him. His questioning by CID agents occurred only after two thorough advisements of his rights without any interrogations and after a period of time sufficient to allow for reflection and deliberation. Thus, even if his initial comment regarding a military lawyer could be construed as a request to "deal with the police only through counsel," *Edwards,* 451 U.S. at 485, 101 S.Ct. at 1885, 68 L.Ed.2d at 386, his rights were scrupulously protected until he waived them. Not only was Sergeant Seeloff's waiver of counsel voluntary, the record clearly establishes that he understood his right to counsel and intelligently and knowingly relinquished it.

## SUFFICIENCY OF EVIDENCE

Sergeant Seeloff claims that the evidence as a matter of law supports only a finding of manslaughter and not premeditated murder. He maintains that he was set into a rage while he was intoxicated by the victim's attempt to sodomize him and her calling him a "nigger." In this drunken frenzy Sergeant Seeloff acted impulsively without reflection or calculation, thus no premeditation or specific intent was present. We do not agree.

■ The defense of voluntary intoxication if established is relevant to the elements of premeditation and specific intent, but even if established will not of itself reduce a homicide below the level of unpremeditated murder. *See* paragraph 197*a*, Manual for Courts-Martial, United States, 1969 (Revised edition) [Manual]; *United States v. Ferguson,* 17 U.S.C.M.A. 441, 38 C.M.R. 239 (1968); *United States v. Stokes,* 6 U.S.C.M.A. 65, 19 C.M.R. 191 (1955). Expert witnesses back-calculated Sergeant Seeloff's blood alcohol content somewhere between 1.68 and 2.54 mg/cc. The government expert, Doctor Murami, freely conceded that the back-calculation method of determining blood/alcohol level was inherently unreliable. Likewise, the defense expert, who calculated Sergeant Seeloff's blood alcohol level to be 2.54 mg/cc at the approximate time of the murder, stated that such calculation was "a rough estimate." Nevertheless, based on the testimony of witnesses

who were with Sergeant Seeloff for a significant time prior to the murder, we find that he was intoxicated to some degree. Other evidence establishes that his intoxication was not so serious so as to prevent him from forming the requisite specific intent. Neither the CQ who talked with Sergeant Seeloff only moments after the killing nor the MP's who observed him a short period thereafter considered him intoxicated. Additionally, Sergeant Seeloff's ability to recall the events prior to and after the killing, plus his detailed recitation of his version of the killing are not indicative of one who was too intoxicated to form the requisite premeditation.

> We started arguing and she kept saying that she wanted to give me a 'head job.' I wouldn't let her and she said 'You are just like a nigger, you are a nigger.' I grabbed her around the neck and started choking her. I choked her for a couple of minutes and my hands started getting tired. I thought she had to be dead because her eyes had already started bulging and she was gasping for breath. I took my hands off her throat and she looked at me and put her hand up like she was going to push me away. I grabbed her around the throat and continued to choke her until I 'did her in.' When I was sure that she was dead I turned her aloose [sic].

When asked why he wanted to kill someone Sergeant Seeloff replied "I guess I just wanted to see what it was like." He also stated that he thought about cutting the victim's throat, but decided not to.

■■■ As to the purported "rage" of Sergeant Seeloff the events depicted by him do not amount to "adequate provocation" for the purposes of reducing the degree of homicide to voluntary manslaughter. Paragraph 198a, Manual, states that "the provocation must be adequate to excite uncontrollable passion in the mind of a reasonable man." The use of insulting or abusive words or gestures are not, standing alone, considered to be adequate provocation. Paragraph 197a, Manual. Although insulting words coupled with apparently repugnant sexual acts are present we find that these factors, even when coupled with the Sergeant Seeloff's intoxication, do not establish adequate provocation. Adequate provocation is an objective concept. Whether Sergeant Seeloff was actually acting in the heat of passion is a subjective determination; however, "unlike passion, provocation must have an objective existence outside the mind of one who kills unlawfully." *United States v. Groza*, 37 C.M.R. 814, 828 (A.F.B.R.1966). We find likewise that this was not a killing done in the heat of passion. While Sergeant Seeloff's initial rage and attack may have been the result of impulse without consideration of the consequences, such cannot be said of his second and deliberate choking of the victim. The reason given by Sergeant Seeloff for stopping the first time was that his hands were tired and he believed that she was already dead. When he learned that she was not, he calmly began choking her again until he was certain that she was dead. He continued his death grip despite the fact that the victim lost control of her bowels and bladder and soiled the bed while he was upon her. After releasing his grip on her throat, he confirmed her death by placing his ear to her chest to assure that the heart had stopped beating.

We find that a sufficient time had elapsed for Sergeant Seeloff to recover from the effects of his initial rage, deliberate, and form the intent to kill his victim.

### SOLICITATION TO ESCAPE

While Sergeant Seeloff was in pretrial confinement he wrote a letter requesting a friend's assistance in making an escape at the conclusion of his trial if he received a sentence to "life, no parole or death." The letter was immediately given to the authorities and no escape was attempted. Sergeant Seeloff now claims that there was insufficient evidence to show that he possessed the specific intent to escape as his request was conditioned on the imposition of certain sentences. We do not agree.

■■■ The offense of soliciation is complete when one communicates to anoth-

er a serious request to commit an offense and that as a result of such communication, it is not unlikely that a crime will result. The proscribed conduct involved in solicitation is the inducing, enticing, or influencing of another to commit an offense punishable under the code. *See United States v. Mitchell*, 15 M.J. 214 (C.M.A.1983); *United States v. Benton*, 7 M.J. 606 (N.C.M.R.1979). Notwithstanding the conditional language in the letter we find that if the recipient had been sympathetic to the request a crime was likely to have occurred. Criminal solicitation was, thus, proven.

The remaining assignments of error are deemed to be without merit.

The findings of guilty and the sentence are affirmed.

Senior Judge FULTON and Judge CLAUSE concur.

## APPENDIX

0567-80 C10F47.

Notes of Private First Class Edkin          SS472

The door is locked. She called me a nigger. I screamed her before I strangled her. I never killed any one before, this is my first time I shoot a few before. I want to be a mersinary. It's preety neat. If I ever get out of prison I want to be a mersinary. Theres no worry, she is dead I checked her breathing and she turned cold and everything. I am a plt. Sgt. if that helps any. Do you ever kill any one before?

D/C. (Answer) No I didn't.
[desk clerk]

You should try it. It's fun. My thumbs were getting tired and it takes a long time. but It's all right. I'm glad I came down her, it beats you guy coming looking for me. I all ready know my rights. I all ready amitted to everything. I want a military lawer. I'm cool and every thing, you look nervas.

986

/9C/ Answer I'm not.

I was thinking about be a mersinary. It wasn't so bad I was holding her down with my hands. It wasn't nothing. I came to you guy, there is no reason why you. should come and get me I was going to be a arservt. make a few buck.

Did they find her yet or are they still looking for her.

D/C Answer I don't know.

I told the c.p all hell is going to break out in about a half-hour or so. Had trouble get a cab. Maybe she a lesbain or something, I don't know, maybe I did wright. I don't know. →I was looking for a knife ~~....~~ I didn't cut her up? I was going to throw her over the fence or something. I didn't rape her though. She wanted it, I gave it to her, she called me a nigger, I didn't like that.← Do you need anything there, your doing a lot of writting there?

Q/C. Answer No just writting.

I kind of take it I can leave here, can I.

Q/C Answer no, you can't.

Are they going to bring CID over here?

Q/C Answer Yes, probably

what are they going to do, ship me
to MANHEID from here or, what?

Q/C Answer I don't know.

You know killing some one suposed to make
you feel bad but I doesn't make me feel
bad. It only took a few mintues too.
She tryed to fight me off. If I go back to
the company I do another one to SGT William,
ANN JOHNSON a hoare too. We only got three hoars
inth the company but know there's only two left. If
I don't get then somebody else will.