UNITED STATES, Appellee

v.

Sergeant Stephen J. SCHAP, 212–70–9023
United States Army, Appellant.

ARMY 9400529.

U.S. Army Court of Criminal Appeals.

29 March 1996.

V Corps C.S. Schwender and C.E. Trant, Military Judges.

For Appellant: Dan R. Hyatt, (argued); Major Michael A. Egan, JA (on brief); Major J. Frank Burnette, JA.

For Appellee: Major Anthony P. Nicastro, JA (argued); Colonel John M. Smith, JA; Lieutenant Colonel Eva M. Novak, JA (on brief).

Before GRAVELLE, JOHNSTON, and ECKER, Appellate Military Judges.

## OPINION OF THE COURT

JOHNSTON, Judge:

Contrary to his plea, the appellant was found guilty by a general court-martial composed of officer and enlisted members of premeditated murder in violation of Article 118, Uniform Code of Military Justice, 10 U.S.C. § 918 (1988) [hereinafter UCMJ]. Although the appellant was sentenced by the members to a dishonorable discharge, confinement for life, forfeiture of all pay and allowances, and reduction to Private E1, they recommended that the confinement be reduced as a matter of clemency. The convening authority approved only so much of the sentence as provided for a dishonorable discharge, confinement for forty-five years, forfeiture of all pay and allowances and reduction to Private E1.

The appellant contends, inter alia, that the evidence is legally and factually insufficient to support a conviction for any offense greater than voluntary manslaughter, that the military judge made numerous errors in regard to instructions to the members, and that the military judge abused his discretion in improperly limiting the testimony of a defense expert and in admitting evidence that was unduly prejudicial. We disagree and affirm.

### Facts

This case involves a sordid tale of infidelity and murder by decapitation.

The appellant and his wife were married in 1989 after a six-month courtship. The appellant took his marriage seriously and wanted it to be a permanent commitment. Because his wife had suffered through three miscarriages during the marriage, the appellant obtained a vasectomy to preclude further suffering on her part.

By December 1991, the wife felt that her feelings for her husband "had pretty much died" and she decided that she could not continue with the marriage. Nevertheless, in December, 1992, she followed her husband to Fulda, Germany, where he was assigned after joining the Army in January, 1992. During 1993, she took advantage of the assignment to Germany and often traveled throughout Europe without him.

The appellant and the victim, Specialist (SPC) Glover, became friends in early 1993. On two or three occasions, SPC Glover visited the appellant and his wife in their quarters. In the summer of 1993, the appellant was required to attend a military leadership training course. While the appellant was away from home, SPC Glover went to the appellant's quarters at least six times and had sexual intercourse with the appellant's wife. The appellant wrote love letters to his wife while attending the course. Although by her own account she no longer loved the appellant at the time and she was having an affair with SPC Glover, she responded with equally passionate correspondence.

By October, 1993, the appellant's wife learned that she was pregnant as a result of her sexual liaisons with SPC Glover. She did not tell the appellant about the pregnancy. She and her husband stopped having sexual relations that same month. In mid-November, 1993, she told the appellant that she no longer loved him and wanted a divorce. Over the Thanksgiving weekend, the couple talked about the details of a separation and divorce. Ultimately they agreed to

a separation and her early return to the United States.

Although the appellant's wife assured him that there was no other man in her life, the appellant was suspicious. He intercepted a letter to her postmarked 29 November 1993, that suggested that she was pregnant. On 5 December 1993, the appellant found his wife's secret diary that indicated she may have had many other lovers during their marriage. When the appellant confronted her, she tried to explain the journal entries as fantasies or innocent relationships. On 6 December 1993, they met with a chaplain as a prelude to the pending separation, and both claimed to have been faithful during the marriage.

On 7 December 1993, the appellant went to work as normal while his wife intended to go to the bank. On the way, she experienced very heavy vaginal bleeding. Because she was afraid she was having another miscarriage, she asked an acquaintance to take her to the local German hospital. After she arrived at the hospital, she was told she would be there for at least a week. She attempted to contact SPC Glover through a legal clerk at the legal assistance office where she had worked as a volunteer. Later in the morning, when the appellant coincidentally stopped by the legal assistance office to obtain some papers in connection with the pending marital separation, that same legal clerk told the appellant that his wife was in the hospital. The appellant was concerned and went to the hospital at approximately 1420 while dressed in his battle dress uniform.

When the appellant arrived at the hospital, his wife informed him that she was pregnant because of an extramarital affair with a person she did not identify. He remained calm and appeared to be concerned about her condition. The appellant left the hospital around 1500 and returned to his quarters to retrieve items his wife had requested for her stay at the hospital. When he had not returned by 1530, she called the quarters twice, but received no answer.

The appellant arrived back at the hospital at approximately 1610 wearing jeans and a jeans jacket. He appeared agitated and questioned his wife about the identity of her lover and the circumstances of the relationship. She told him that the child was conceived while she made love on a quilt in the appellant's living room. The appellant and his wife agreed that the lover should come to the hospital where she was undergoing treatment for the possible miscarriage. She also informed him that she had made arrangements for a message to be delivered to her lover so he could come to her side. While the appellant was in the room with her, she called the legal clerk to see if the message had been delivered. Although the appellant did not learn of SPC Glover's identity at that time, he learned that the lover held the rank of specialist.

Approximately ten minutes later, the appellant called the legal clerk and asked, "did you deliver the message to the specialist?" The legal clerk said he was going to do so, but did not reveal the identity of the intended recipient. He then asked the appellant if he knew where a particular barracks was located.

The appellant immediately drove to the location of the barracks, approached the staff duty noncommissioned officer (NCO), and explained that he needed to find the legal clerk who was looking for a room and that he also needed to find that same room. When the staff duty NCO asked the appellant which soldier he was looking for, the appellant said, "forget it" and departed. At approximately the same time, the legal clerk found the correct room and placed a message under SPC Glover's door. He also had SPC Glover paged to ensure that he was notified that the appellant's wife wanted him to join her at the hospital.

The appellant, who by this time was aware that SPC Glover was the paramour, began looking for him. At some point the appellant had obtained a fighting knife with an eight-inch double-edged blade that he brought with him in his car. The appellant, acting normal, asked a soldier near the barracks dining facility if he had seen SPC Glover. The soldier informed the appellant that SPC Glover was in the telephone booth adjacent to

the dining facility. The appellant replied, "[w]ell, I guess he got the message."

Specialist Glover had answered the page and had spoken with the legal clerk. He also had retrieved the message from under his door. At approximately 1715 he called the appellant's wife at the hospital. While SPC Glover was talking on the telephone with the appellant's wife, the appellant approached the telephone booth. Without confronting SPC Glover or giving him any chance to explain what had happened, the appellant stabbed and slashed his intended victim in the back of the neck. Specialist Glover attempted to flee but slipped to the ground. The appellant pursued, ran past his fallen victim, turned and knelt over him and stabbed and cut him ten to twenty times in the throat, practically severing his head. A witness described some of the motions involved in the attack as if the appellant was "cutting meat or skinning a deer." Another witness described it as "slow" and "rhythmic," "sort of like a sawing motion."

After stabbing the victim, the appellant stood up and kicked SPC Glover in the head several times. The head separated from the body and rolled several feet away. The onlookers were stunned at the severity of the attack and sickened with the results. One soldier, who observed the attack, vomited at the sight. The appellant, on the other hand, walked over to the head, picked it up by the hair, held it aloft and announced in a loud clear voice, "[t]his is what happens when you commit adultery." He also stated in a sarcastic tone, "[a]nd he said he was sorry." The appellant then turned and walked at a brisk pace to his car, carrying the head under his arm "like a football."

A short time later the appellant was observed near his car that was stopped on a bridge over a stream. When another car approached, he quickly departed from the area. The appellant continued on his way and parked several hundred yards from the hospital.[1] He removed his blood-stained jacket and shirt, put on an olive-colored jacket, and entered the hospital while carrying an athletic bag. He entered his wife's small hospital room and removed SPC Glover's head from the athletic bag. He appeared agitated and very upset. He held the head in both hands and thrust it toward his wife's face and chest. She screamed and cowered while the appellant set the head facing his wife on an adjacent night stand. He sat down on the bed and said, "Glover's here, he'll sleep with you every night now, only you won't sleep, because all you'll see is this."

As startled medical personnel rushed to the room, the appellant remained seated on the bed, with his legs extended over his wife's legs, his hand on her chest trying to make her look at the head. He said to the German doctors "[g]ood, you stay here, and listen to everything that I have to say, remember as much as you can." He also stated, "I'm her husband, and she's an adulteress, not just with that man, ... but many times over." His wife described his statements as follows:

> He turned to me, he said, "you know," he said, "you gave me enough clues. It was easy enough to figure out who it was. It was easy enough to do this." And he told the doctors, "I'm not normally a violent man. This is my only violent act, but don't underestimate me, I'm very skilled at what I do. I studied this, I planned this, I calculated this." And he turned to me and he said, "I did this for you, because I love you."

When she asked him what he did with the body and the knife the appellant replied:

> I'm not that stupid.... I don't care if they put me in jail for the rest of my life, because I'll just think about you. And I don't care if they put me to sleep, if they kill me, because I'll just think about you while they do it.

One of the German doctors testified that the appellant "behaved in a calm way" in the midst of the extraordinary situation at the hospital. The appellant asked for a bucket of water to wash his hands. He told the doctor that he "felt mistreated, humiliated, cheated

---

1. While the knife scabbard was recovered from the appellant's car, the knife used to kill the victim was never found.

on." He took off his identification tags and threw them at the German police who arrived on the scene and said, "[t]here's my name, I'm Stephen Schap." He also said they should stay and listen to everything he had to say and be witnesses, but he'd go peacefully only when the military police arrived. Ultimately, the German police on the scene dragged the appellant from the room.

Shortly after he was apprehended, the appellant stated that his wife "shouldn't have done what she'd done," and that he "shouldn't have done what he'd done either," but he "realized what he did" and he would just have to "pay for it." He was described by one witness as being "mighty calm about it." The witness testified that the appellant "didn't appear upset at all."

The appellant's car was located several hundred yards from the hospital. The gas tank was full. Inside, authorities found a change of clothing, food, shaving items, closed-out bank account records, appellant's passport, small amounts of six types of foreign currency, telephone records, diplomas, and tax records. Although prior to the incident, the appellant had received permission to travel to the Netherlands for the weekend of 11–13 December 1993, some of the items found in the car normally were stored in boxes at the appellant's quarters.

At his court-martial the appellant, who did not testify on the merits, never contested the fact that he had brutally attacked SPC Glover and taken the severed head to the hospital. His entire defense was that he acted in the sudden heat of passion in committing the crime of voluntary manslaughter.

### Assigned Errors

The appellant contends, inter alia, that the evidence at trial was legally and factually insufficient to sustain any offense other than voluntary manslaughter.[2] Although the law recognizes that a "person may be provoked to such an extent" that "a fatal blow may be struck before self-control has returned," there are very specific requirements for a finding of voluntary manslaughter. *See* Manual for Courts–Martial (1995 Edition)

[hereinafter MCM], Part IV, para. 44c(1)(a); *see also United States v. Maxie*, 9 U.S.C.M.A. 156, 25 C.M.R. 418 (1958); *United States v. Edwards*, 4 U.S.C.M.A. 299, 15 C.M.R. 299 (1954); *United States v. Saulsberry*, 43 M.J. 649 (Army Ct.Crim.App.1995); *United States v. Morgan*, 33 M.J. 1055 (A.C.M.R.1991), *aff'd*, 37 M.J. 407 (C.M.A. 1993); *United States v. Seeloff*, 15 M.J. 978 (A.C.M.R.1983).

 In order for an unlawful killing to be reduced from murder to voluntary manslaughter the homicide must be committed in the "heat of sudden passion" which is "caused by adequate provocation." MCM, Part IV, para. 44c(1)(a). For the provocation to be "adequate," however, the provocation must be of a nature to "excite uncontrollable passion in a reasonable person, and the act of killing must be committed under and because of the passion." *Id.* Although the "passion may result from fear or rage," the provocation can not be "sought or induced" by the killer. *Id.* Furthermore, "[i]f, judged by the standard of a reasonable person, sufficient cooling time elapses between the provocation and the killing, the offense is murder, even if the accused's passion persists." *Id.*

 The test for legal sufficiency is whether, considering the evidence in the light most favorable to the prosecution, a reasonable fact finder could have found all the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *accord United States v. Turner*, 25 M.J. 324 (C.M.A.1987). We are satisfied that the evidence of record more than meets this standard as to premeditated murder.

 The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of the appellant's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325. In applying this test, we make the following findings.

### NO OFFENSE GREATER THAN VOLUNTARY MANSLAUGHTER.

2. ASSIGNMENT OF ERROR I (AE). THE EVIDENCE SUPPORTS A VERDICT OF GUILTY TO

First, we find that upon his wife's verification of his suspicions that she was unfaithful, the appellant set about to identify and track down the paramour. This was to be accomplished through his questioning of his wife, his contact with the legal clerk who was to deliver the message to the paramour, and his questions to the staff duty NCO.

Next, and most importantly, we find that the appellant intended to murder his wife's paramour, regardless of who it was. He planned to accomplish this objective by using the large fighting knife he brought along for that very purpose. We reject the suggestion that the appellant only intended to confront the paramour and brought along the knife in case matters became unmanageable.

We also find that the nature and severity of the attack, coupled with the appellant's vigorously kicking SPC Glover's head, led to the head being severed from the body. Once the head was severed the appellant picked it up and made his coldly calculated comment about the deadly price of adultery.

We further find that the appellant carefully prepared for his escape and intended to flee from the scene of the crime. Once he held the severed head aloft, however, he realized that his identity would become known. Consequently, he determined to inflict the maximum emotional suffering upon his wife before he was apprehended. All of his conduct prior to the attack, along with his comments at the scene, at the hospital to his wife and the doctors, and to the police, convinces us that the murder was a premeditated act rather than a crime committed in the heat of passion.

In order to prevail on his contention that his crime was voluntary manslaughter, we would have to be persuaded that the evidence presented by the government was insufficient to prove premeditated murder or unpremeditated murder. We find, however, that the murder was consummated in a cold and calculating manner. We further find that the appellant had not lost self-control at the time he killed SPC Glover. We specifically reject the defense contention that the learning of the paramour's identity triggered an uncontrollable rage. The evidence shows that the intent to kill was present before the identity of the paramour was known.

We also specifically find the appellant did not kill SPC Glover while under the influence of uncontrolled passion and because of that passion. Our conclusion is that once the appellant learned of the lover's identity, he specifically intended to kill SPC Glover, that he contemplated and planned SPC Glover's murder, and that he had adequate "cooling off" time to reflect upon the consequences before he acted.

We have carefully evaluated the entire record of trial, and conclude, applying our fact-finding powers of Article 66, UCMJ, that the appellant methodically planned the murder. In short, this was a premeditated murder in violation of Article 118(1), UCMJ, rather than voluntary manslaughter under Article 119, UCMJ.

The appellant has assigned three errors in regard to instructions or lack thereof from the military judge.[3] In this case the military judge gave the standard instructions for premeditated murder, unpremeditated murder, and voluntary manslaughter. *See* Dep't of the Army, Pam. 27–9, Military Judges' Benchbook, para 3–86; 3–87. At various points in the instructions he correctly discussed heat of passion. At no time did the defense object to or request additional instructions. The trial defense counsel's failure to object to an instruction or omission of an instruction constitutes waiver of the objection in the absence of plain error. Rule for Courts–Martial 920(f). *See United States v.*

---

3. AE II. THE FAILURE OF THE MILITARY JUDGE TO INSTRUCT THE MEMBERS AS TO THE GOVERNMENT'S BURDEN OF PROOF ON HEAT OF PASSION DENIED APPELLANT DUE PROCESS OF LAW.

AE III. THE MILITARY JUDGE COMMITTED PLAIN ERROR IN HIS INSTRUCTIONS TO THE MEMBERS OF APPELLANT'S COURT MARTIAL.

AE IV. THE MILITARY JUDGE COMMITTED PLAIN ERROR BY FAILING TO INSTRUCT THE MEMBERS SUA SPONTE ON ISSUES WHICH WERE RAISED BY THE EVIDENCE, AND BY FAILING TO TAILOR HIS INSTRUCTIONS.

*Morgan,* 37 M.J. 407 (C.M.A.1993); *see also United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). We are satisfied that the instructional errors, if any, did not rise to the level of plain error. The instructions, when taken as a whole, were appropriate and complete. We hold that the assignments of error concerning the military judge's instructions or lack of instructions are without merit.

■ The appellant next contends that the military judge abused his discretion in limiting the testimony of the defense expert about rage and premeditation.[4] The military judge permitted the defense expert to testify over government objection. The expert's testimony was directed at states of mind in general. The military judge permitted the witness to testify about how long an individual could remain in a state of rage. He also correctly allowed the expert to discuss a person's ability to reflect on their actions. The military judge properly limited the expert discussion to prevent confusion between the concept of reflection and the legal standard of premeditation. Thus, the assigned error is without merit.

■ The appellant also contends that the military judge abused his discretion in refusing to allow the defense psychiatrist to testify that at the time of the offense the appellant was in a rage.[5] To the contrary, the military judge allowed the expert to testify about these matters. He properly would not allow the expert to bring before the members those comments made by the appellant during his clinical interviews. The expert was allowed to testify about the basis of his conclusions, but he was not allowed to place the appellant's version of events before the members without the benefit of cross-examination

of the appellant himself. The assigned error is without merit.

■ The appellant further contends that the military judge abused his discretion in admitting several books and catalogs concerning knives into evidence.[6] Apparently government investigators searched through the appellant's bookshelves in an effort to find any link to the use of knives as weapons. This issue was fully litigated at an Article 39(a), UCMJ, session prior to trial on the merits. Government counsel offered the books on the theory that they provided corroboration of the appellant's admissions or confession. *See* Military Rule of Evidence. 304(g). The trial defense counsel contended that the books would be taken out of context and would prove to be more prejudicial than probative. In his view, it would not be unusual or probative of anything to find that a soldier in the United States Army possessed books or catalogs that had pictures or articles about knives and self defense. The military judge made specific findings that the items were probative and that no unfair prejudice would result to the appellant if the books were admitted into evidence. In addition, he offered the trial defense counsel the opportunity to put the books into their proper context by use of testimony and photographs. The defense presented evidence, and directed its cross-examination to highlight that the appellant merely possessed the books and that the government presented no proof that he relied upon them in executing his alleged crime.

We are satisfied that the military judge did not abuse his discretion regarding this issue. In addition, even if the military judge erred in allowing the materials into evidence, we hold that the appellant suffered no unfair

4. AE V. THE MILITARY JUDGE ABUSED HIS DISCRETION IN PROHIBITING THE DEFENSE EXPERT, DR. REYNOLDS FROM TESTIFYING AS TO THE RELATIONSHIP BETWEEN A STATE OF RAGE AND THE ABILITY TO PREMEDITATE.

5. AE VI. THE MILITARY JUDGE ABUSED HIS DISCRETION IN REFUSING TO ALLOW THE DEFENSE PSYCHIATRIST TO TESTIFY AS TO THE BASIS FOR HIS OPINION THAT, AT THE TIME OF THE OFFENSE, APPELLANT WAS IN A "RAGE".

6. AE VII. THE MILITARY JUDGE ABUSED HIS DISCRETION IN ALLOWING EVIDENCE THAT THE APPELLANT POSSESSED A "KNIFE BIBLE" A MILITARY SUPPLY CATALOG, AND OTHER BOOKS WHICH WERE OFFERED AS EVIDENCE OF "PLANNING ACTIVITY," BUT WHICH WERE POSSESSED BY APPELLANT LONG BEFORE HE HAD ANY MOTIVE TO KILL ANYONE.

prejudice, as we are confident that the members gave the books little weight. The members certainly recognized that many soldiers, including the appellant, possess books and catalogs that featured military equipment, including knives. We also are confident that the members recognized that many soldiers were likely to have materials about knives and guns in their personal libraries.

This murder case is unusual only in regard to the decapitation and display of the head. There was little if any dispute as to the acts involved. Our review of the record convinces us that the government carried the burden to prove premeditated murder beyond a reasonable doubt. Our review also convinces us that the alleged errors are without merit.

The findings of guilty and the sentence are affirmed.

Senior Judge GRAVELLE and Judge ECKER concur.