UNITED STATES

v.

Jeffery L. HARDISON, 393 74 2104,
Corporal (E–4), U.S. Marine Corps.

NMCM 83 1087.

U.S. Navy-Marine Corps Court of
Military Review.

Sentence Adjudged 9 July 1982.

Decided 9 Dec. 1983.

LCDR William A. DeCicco, JAGC, USN, Appellate Defense Counsel.

LT Michael P. Cogswell, JAGC, USNR, Appellate Government Counsel.

Before EOFF, C.J., and GORMLEY and MIELCZARSKI, JJ.

EOFF, Chief Judge:

At his general court-martial before officer and enlisted members, appellant was convicted, contrary to his plea, of unpremeditated murder, a violation of Article 118, UCMJ, 10 U.S.C. § 918, Uniform Code of Military Justice. On 9 July 1982, the court sentenced appellant to be confined at hard labor for 30 years, to forfeit all pay and allowances, to be reduced in rate to pay grade E–1, and to be dishonorably discharged from the naval service.

Appellant asserts eleven assignments of error before this court. Finding no error prejudicial to the substantial rights of appellant, we affirm. The following assignments of error warrant discussion.

## I.

THE STAFF JUDGE ADVOCATE WAS DISQUALIFIED FROM SUBMITTING A POST–TRIAL REVIEW BECAUSE HIS PRETRIAL ADVICE WAS DEFICIENT AND WAS ATTACKED AT TRIAL.

## II.

THE COURT THAT TRIED AND SENTENCED THE APPELLANT WAS WITHOUT JURISDICTION DUE TO THE PROVISIONS OF THE MILITARY BASES AGREEMENT OF 1947 BETWEEN THE UNITED STATES AND THE REPUBLIC OF THE PHILIPPINES.

## III.

THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT BY DENYING THE DEFENSE MOTION TO SUPPRESS PHOTOGRAPHS AND THE FINGERPRINTS OF THE APPELLANT.

## VIII.

THE GOVERNMENT DID NOT PROVE APPELLANT'S GUILT BEYOND A REASONABLE DOUBT.

## X.

IN LIGHT OF THE CONTENTS OF THE CLEMENCY PETITION, THE RECOMMENDATION OF THREE OF THE COURT MEMBERS, AND ALL OF THE MATTERS PRESENTED IN EXTENUATION AND MITIGATION, THE APPROVED SENTENCE IS INAPPROPRIATELY SEVERE.

## I.

At trial, appellant challenged the Article 34, UCMJ, 10 U.S.C. § 834, advice letter as inadequately discussing both the constitutionality of the death penalty in the military and the issue of jurisdiction. Appellant now asserts that it was error for the drafter of the challenged Article 34 advice to prepare the Staff Judge Advocate's (SJA) Review after trial. We disagree.

If the Article 34, UCMJ, advice is correct in all material aspects, both fact and law, then the drafter is not disqualified to act as the post-trial reviewer. *United States v. Collins,* 6 M.J. 256 (C.M.A.1979). The Article 34 advice in the case *sub judice* ade-

quately explained the status of the law with regard to the death penalty, advising that the constitutionality of the death penalty was presently being reviewed and that the death penalty was an authorized punishment until otherwise decided.

Appellant correctly points out that no discussion was included in the SJA's Article 34, UCMJ, advice letter about the effect on jurisdiction of the Military Bases Agreement between the United States and the Republic of the Philippines. As discussed, *infra,* we find that the Philippine authorities had properly waived primary jurisdiction before the Article 34, UCMJ, advice letter was complete; thus, the Article 34 advice was correct and complete in all material aspects, and the drafter was not disqualified to act as the post-trial reviewer.

## II.

■ The Military Bases Agreement gives to Philippine authorities primary jurisdiction over offenses committed by U.S. military personnel within the Republic of the Philippines. The agreement allows and encourages waiver of primary jurisdiction by one sovereign in response to a request by the other. In his second assignment of error, appellant challenges the jurisdiction of his court-martial on the grounds that the Philippine authorities had not waived their right to primary jurisdiction under the Agreement.

This offense occurred in a civilian area of the Philippines on 14 November 1981. Appellant left the Philippines with his unit on 30 November 1981, and it was not until 15 April 1982 that the Philippine authorities notified the Commander of the Naval Base in Subic Bay that a murder complaint had been filed against appellant and requested that he be placed on legal hold. The SJA informed the Philippine authorities that the request could not be served since appellant was no longer in the Philippines and had not been a suspect when he returned to his permanent duty station.

Because there was no extradition treaty nor other means to compel appellant's presence in the Philippines, and having been advised of the intent of the U.S. Navy to try appellant for the murder, the City Fiscal of Olongapo City dismissed the charges against Hardison on 2 June 1982, five days before the present charges were referred. Jurisdiction had thus been waived by the Philippine Government in accordance with the terms of the Military Bases Agreement at the time charges were referred against appellant.

■ Even if we harbored any question about the merits of the issue of jurisdiction, we do not believe appellant has standing to contest jurisdiction based on a treaty between the two sovereigns. *United States v. Evans,* 6 M.J. 577 (A.C.M.R.1978), *pet. denied,* 6 M.J. 239 (C.M.A.1979).

## III.

Appellant's next assignment of error challenges the seizure, without probable cause, of his fingerprints and the use of a photographic line-up in which he was required to participate.

After investigating the murder scene on 15 November 1981, the Naval Investigative Service (NIS) learned that a Black American, probably a Marine from the USS ALAMO or the Marine Barracks at Subic Bay, described as about 6 feet tall with a medium to light complexion and blue or hazel eyes, had been seen around the victim's apartment on 14 November. It was suspected that the assailant had cut himself since blood other than the victim's was found at her apartment. On 16 November, upon request by the NIS, the Commanding Officer of the local Marine unit assembled all of his Marines so that one of the victim's neighbors could observe the formation to see if she recognized the man she had seen around the victim's apartment on the 14th. After passing by the formation twice, the neighbor indicated that appellant appeared similar to the individual she had seen with the victim between the 10th and 15th of November. Appellant and another Black suspect, whose eyes fit the description given, were asked to accompany the NIS agents to their office after the formation.

Appellant's commanding officer directed him to go with the NIS agents and fully cooperate with them. The military judge found that at the time appellant was taken to the NIS office, probable cause did not exist to believe he had committed the murder and that at the NIS office, appellant was subjected to a custodial interrogation.

■ In determining the legality of such a seizure of physical evidence from a person, both the initial seizure that brings the person in contact with government officials and the actual seizure of the physical evidence must be scrutinized in light of the fourth amendment. *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973). In the case *sub judice* we must decide first whether appellant's fourth amendment rights were violated when he was required to accompany the NIS for questioning and, second, whether an illegal seizure occurred when appellant was photographed in a line-up and fingerprinted with neither a warrant nor probable cause.

In *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), a detective, suspecting that Dunaway was involved in a robbery-murder, but without probable cause, had him picked up at a neighbor's house and brought to the police station for questioning. Dunaway was neither booked nor told he was under arrest prior to questioning. His subsequent incriminating statements were entered into evidence at his trial, and he was convicted. The Supreme Court held that such custodial interrogation on less than probable cause was in violation of the fourth amendment and, therefore, the incriminating statements should have been suppressed as fruits of the illegal seizure. In *United States v. Schneider,* 14 M.J. 189, 192 (C.M.A.1982), the Court of Military Appeals observed that "There are obvious differences between the military and civilian practices which prevent literal application of the *Dunaway* doctrine." The Court, however, did not expound on the implications of these obvious differences nor did they give any guidance on the *extent* to which these differences justify an exception to the holding of *Dunaway.* We will define more precisely the exception to *Dunaway* which is essential in the military setting.

In civilian society a person's freedom to come and go as he pleases is scrupulously guarded. A person cannot be forced by the government to report to a particular place except in certain narrowly prescribed situations. A person can neither be arrested in the absence of probable cause nor even detained briefly against his will absent a reasonable suspicion that he has committed or is about to commit a crime. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). One of the purposes of the fourth amendment is to ensure this freedom from unjustified government intrusion. *Kolender v. Lawson,* —— U.S. ——, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983).

Even in civilian society a person is not totally free from government intrusion into his freedom. The Supreme Court has found that a grand jury subpoena requiring a person to appear and submit voice exemplars is a reasonable and justified intrusion into that person's freedom. *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973). The Court held that such an order to appear during an investigation is not a "seizure" within the meaning of the fourth amendment. *Id.*

As recognized in *Schneider,* an entirely different atmosphere exists within the military. A service member does not have the same freedom to come and go as does his civilian counterpart. A service member is simply not free to ignore a lawful order given by his superior to report to a specified place. Article 92, UCMJ, 10 U.S.C. § 892; *United States v. Sanford,* 12 M.J. 170 (C.M.A.1981). Thus a requirement to report to a particular office or place is a much less substantial intrusion into a service member's expectation of freedom than that of his civilian counterpart.

In *Sanford,* the appellant, suspected of being involved in a drug transaction, was told that his battalion commander wanted to talk with him. Sanford promptly reported to the battalion commander's office where he was interrogated and incrimina-

ting evidence was seized. The Court of Military Appeals avoided the literal application of *Dunaway* in that situation by holding that an order to report is not a "seizure" as long as there is no objective indications surrounding that order that it was for law enforcement purposes. In *United States v. Price*, 15 M.J. 628 (N.M.C.M.R.1982), this Court took a similar approach where Price was "detailed by the command" for an NIS interview along with nine of his shipmates. The interviews took place on a non-workday at NIS offices with security forces present to "ensure the integrity of office spaces and to direct the ten subjects to administrative amenities." 15 M.J. at 631. The Court, citing *Dunaway* and *Schneider*, concluded that this was not a "seizure" within the meaning of the fourth amendment.

▮ While in *Sanford* the Court found that the order to report was not a seizure due to the absence of objective indications that the order to report was for law enforcement purposes, we believe that a service member is not free to disobey an order to report even if it is for law enforcement purposes. The intrusiveness of the order does not increase because of its purpose. Consequently, we are of the opinion that in the military, an order to report, regardless of the reason, is not a seizure within the meaning of the fourth amendment.

▮ Finding that appellant was lawfully required to be at the NIS office, we must scrutinize the photographing and fingerprinting of appellant. It is clear that a person has no expectation of privacy in his general appearance and facial characteristics. *United States v. Mara*, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973). Thus, in a military setting, just as one can be required to report to a specified place, one can also be required to stand for a photograph. Therefore, we find no fourth amendment violation with the use of these photographs in an identification procedure four months later nor with their admission into evidence.

The application of the fourth amendment to a person's fingerprints has not been clearly defined. In *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), where appellant was detained, fingerprinted, and questioned without probable cause, the Supreme Court stated that fingerprints are subject to the fourth amendment and must be excluded if illegally obtained. The Court recognized that fingerprinting was a reliable and minimally intrusive investigative procedure and suggested that "narrowly circumscribed procedures might be developed for obtaining fingerprints from people where there was no probable cause to arrest them." Specifically the Court stated:

Detentions for the sole purpose of obtaining fingerprints are no less subject to the constraints of the Fourth Amendment. It is arguable, however, that, because of the unique nature of the fingerprinting process, such detentions might, under narrowly defined circumstances, be found to comply with the Fourth Amendment even though there is no probable cause in the traditional sense. * * * Detention for fingerprinting may constitute a much less serious intrusion upon personal security than other types of police searches and detentions. Fingerprinting involves none of the probing into an individual's private life and thoughts that marks an interrogation or search. Nor can fingerprint detention be employed repeatedly to harass any individual, since the police need only one set of each person's prints. Furthermore, fingerprinting is an inherently more reliable and effective crime-solving tool than eyewitness identifications or confessions and is not subject to such abuses as the improper line-up and the "third degree." Finally, because there is no danger of destruction of fingerprints, the limited detention need not come unexpectedly or at an inconvenient time. For this same reason, the general requirement that the authorization of a judicial officer be obtained in advance of detention would seem not to admit of any exception in the fingerprinting context.

*Davis*, 394 U.S. at 727, 89 S.Ct. at 1397.

▮ Since *Davis*, the Supreme Court has suggested that fingerprinting is not a search within the fourth amendment. *See*

3 W. LaFave, *Search and Seizure,* 19.6 (1978); *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973) (fingerprints described as "physical characteristics ... constantly exposed to the public"); *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (analogized the taking of voice exemplars to "fingerprinting ... [which] itself involves none of the probing into an individual's private life and thoughts that marks an interrogation or search . . . ."). Fingerprinting is consistently upheld where the person is already in the legal custody of the government, *United States v. Sechrist,* 640 F.2d 81 (7th Cir. 1981); *United States v. Sanders,* 477 F.2d 112 (5th Cir.1973), and has even been upheld when the person was taken into custody specifically for the purpose of collecting his fingerprints,.*Hayes v. State,* 439 So.2d 896 (Fla.Ct.App. 2d Dist.1983). We note that fingerprinting is not included in Military Rules of Evidence 312 which proscribes bodily views and intrusions in the absence of probable cause or other specific factors. *See also In Re Grand Jury Proceedings,* 686 F.2d 135 (3d Cir.), *cert. denied,* 459 U.S. 1020, 103 S.Ct. 386, 74 L.Ed.2d 517 (1982). Consequently, we find that the fingerprinting of appellant in the circumstances of this case where he was already lawfully required to be at the NIS office was reasonable and not in violation of the fourth amendment.

### VIII.

◼ In his eighth assignment of error, appellant asserts that the proof adduced at trial ·was insufficient to support the finding of guilty. We disagree. Following are some of the facts which were established by the evidence at trial:

1. The victim worked as an "entertainer" at the CPO club on base and never missed work.

2. On 13 November, the victim spent the night with a Master Chief who described a black digital watch that she was wearing. The victim left him around 0700 on the 14th.

3. A neighbor of the victim testified that she had seen appellant at the victim's house on 14 November at 0800 and again at 1130. She spoke with him around 1130 and testified that he seemed angry. He inquired about the girl living at the victim's address and told the neighbor that the girl was his girlfriend but, when asked, did not know her name. Later the neighbor saw appellant hurry by her store away from the victim's house.

4. Another neighbor, the victim's landlady, testified that she saw appellant around lunchtime on 14 November talking with the victim outside of her house and saw him remain at the house while the victim left. Appellant asked the landlady if she had an extra key to the girl's house and stated that if the girl did not return by 1230 he would call the police because she had stolen his gold necklace. The landlady later saw appellant enter the yard with the victim and heard them enter the house. She never saw the victim after that.

5. On 14 November, the victim failed to show up at 1700 for work.

6. The body was discovered around 1800 on 15 November.

7. At the NIS interview, appellant denied knowing the victim or ever having been at her house.

8. Blood of the same type as appellant's was found in the victim's bathroom and on a roll of tissue paper. At 1400 on 14 November, appellant received nine stitches in two fingers on his right hand for cuts which he told the hospital corpsman he received while sharpening a K-bar knife on base. On 16 November, appellant told an NIS agent that he received the cuts while inspecting a bolo knife that a civilian was trying to sell to him.

9. Appellant's fingerprint was found on a Scotch bottle in the victim's house.

10. On different occasions over the next several months, appellant told several friends that he had killed the Philippino girl. He told them that he had gone to his bag to get some pesos to pay her for sex but got a knife instead and began stabbing her.

He told them that while stabbing her he dropped the knife and cut himself, became angry, and stabbed her more. Appellant further explained to his friends that he wrapped his hand in tissue and threw the knife in a river before returning to base. The details of his story were consistent each time he talked about the killing.

11. Appellant said that he wiped off everything he had touched in her house. He described a radio in the victim's bedroom that he tried to take but said it would not fit in his bag. The radio, just as described, was found in the bedroom where the body was discovered.

12. Appellant also showed one of his friends a black digital watch which he said he had taken from the Philippino girl after killing her.

13. Appellant told one of his friends that his tennis shoes had so much blood on them that he had to throw them away. The witness testified that he accompanied appellant when he bought a new pair of tennis shoes on the day after the body was discovered.

These facts alone are sufficient to convince us beyond a reasonable doubt of appellant's guilt.

### X.

Finally, appellant suggests that his sentence is inappropriately severe in light of the evidence offered in mitigation. Appellant presented numerous witnesses to attest to his character and reputation for peacefulness and as a law abiding citizen. There was also evidence from appellant's family and superiors that he was a proud, respectful, conscientious marine who exhibited a great deal of potential. This does little, however, to mitigate this grotesquely brutal murder in which the victim was stabbed approximately eighty times. Furthermore, the evidence demonstrated that appellant, rather than show the slightest remorse in the months following the murder, repeatedly bragged to his friends about his misdeed. We are firmly convinced that the sentence is not inappropriately severe.

Accordingly, the findings and sentence as approved on review below are affirmed.

Judge GORMLEY and Judge MIELC-ZARSKI concur.