OPINION OF THE COURT
RABY, Senior Judge:
Contrary to his pleas, appellant was convicted of the unpremeditated murder of his wife in violation of Article 118, Uniform Code of Military Justice [hereinafter cited as UCMJ], 10 U.S.C. § 918 (1976). He was sentenced to a dishonorable discharge, confinement at hard labor for 50 years, forfeiture of all pay and allowances, and reduction to the lowest enlisted grade. The convening authority approved the findings and the adjudged sentence.
I. THE FACTS
Appellant’s wife, Emily, had been in Germany only ten days at the time of her death. Prior to her arrival on or about 8 August 1982, the appellant had received permission for Emily to stay with Sergeant Worth’s family and had phoned Emily from Sergeant Worth’s home. While it is apparent that Emily and the appellant were experiencing marital difficulties prior to Emily’s arrival in Germany (Sergeant Worth overheard telephone conversations regarding divorce), contradictory evidence regarding the nature and degree of this discord was adduced at trial (appellant informed Specialist Four McBride that Emily wanted a divorce, but Emily told Mrs. Worth that she loved her husband and wanted to stay with him). Emily lived with Sergeant and Mrs. Worth from the, time she arrived in Germany until her death.
On the evening of 18 August 1982, Emily was at the Worth’s home and the appellant was at the Pinder and Nashville clubs. At about 2350 hours, Emily called appellant because she was worried about him. Although appellant indicated he would come home shortly, he did not return until about 0120 hours, 19 August. Emily appeared worried but not angry that the appellant was late. Mrs. Worth went to bed just as appellant arrived and did not overhear any conversation.
During an interview conducted on 19 August 1982, appellant gave an agent of the Criminal Investigation Command (CID) the following information. He claimed that upon his late return to the Worths’ quarters his wife became upset, criticized him, and left the house. Approximately 20 minutes later, when Emily failed to return, appellant searched for her and reported to the military police that she was missing. In a subsequent confession (Prosecution Exhibit 2) which we find properly admitted at trial (see IY, infra), appellant claimed he thereafter continued to search for Emily and found her walking along the road near the canal. Appellant asked Emily to get into the car and she refused. When appellant persisted, Emily became verbally abu *375 sive. She called appellant “a nobody,” a “pompous ass,” and other names. She insulted appellant’s father and deceased mother, praised her family, and made remarks calculated to anger appellant and to hurt him emotionally. Appellant told Emily to stop saying these things, grabbed her, and shook her, but Emily persisted in her remarks. When appellant grabbed Emily a struggle ensued. Emily scratched appellant and he pushed her to the ground. She hit the pavement hard, and appellant told her to get in the car. Emily refused and again insulted appellant and his family. Appellant begged Emily to stop and put his hand over her mouth to silence her. Appellant denies knowing how long he held Emily or if she struggled against him. When he let her go, she fell to the ground. Appellant knelt beside Emily and realized she wasn’t breathing. He attempted to revive her by both cardio-pulmonary and mouth-to-mouth resuscitation, but his efforts were unsuccessful. Appellant moved Emily’s body and laid it “in the bushes next to the road,” because he did not want her body lying in the street. Appellant maintains that he then returned to the Worths’ quarters.
At approximately 0330 hours, appellant entered the Worths’ bedroom and announced that Emily had left the house following a discussion with him and that she had taken her purse. Mrs. Worth observed that appellant’s eyes “were kind of glaring —dazed” and she found it odd that Emily had taken her purse as Emily had not taken her purse on other occasions when she walked. Appellant then left, saying that he was going to look for Emily.
Sergeant Forth informed the court that at about 0330 hours, during his duty as desk sergeant, appellant had entered the station and reported Emily missing. Sergeant Forth noted that appellant had appeared to be agitated, hurried, and quite excited. He also noticed that there were three scratches on the outside of appellant’s left bicep, which Sergeant Forth believed to be “fingernail scratches.” Appellant did not appear intoxicated at that time.
The Chief of the Department of Pathology at the U.S. Army Hospital at Nürnberg, Major Roger M. Fossum, MC, conducted the autopsy on Emily’s body. Emily weighed between 160 and 170 pounds, as compared to the accused who then weighed 157 pounds. Major Fossum placed Emily’s time of death between 0300 and 0600 hours, 19 August 1982, noting that, based upon his experience, he “would lean toward the earlier time frame within that” period, somewhere from 0300 to 0500 hours. The cause of death was asphyxia due to suffocation. Major Fossum identified numerous external abrasions or scrapes of the skin in the facial area and a few such marks on the right arm of the body. There were numerous petechial hemorrhages[1] within Emily’s eyes and eyelids, on her neck, and on her left shoulder. Two superficial, parallel, linear scratches or abrasions were found on her left nostril. Other minor abrasions were located on both cheeks and also over the bridge of her nose. Two slight, reddish areas of discoloration were detected on the top of her scalp. There was a large abrasion, about six centimeters long, on her right mid-forearm and there were several small abrasions and scratches around the front and back elbow area of her right arm. There was a large area of contusion and abrasion inside her mouth and there were contusions and abrasions on the inside of her upper and lower lips. The fingernails on the middle and small fingers of her left hand were broken and one of these breaks appeared to be fresh.
Major Fossum stated that the injuries to Emily’s lips and mouth, in the “greatest likelihood,” were caused by forcibly placing a hand across Emily’s mouth and, perhaps, her nose. The scratches on Emily’s nose were likely caused either by the appellant or by Emily’s fingernails when she attempted to pull the appellant’s hands from her face. The presence of certain petechial hemorrhages on both sides of Emily’s neck, coupled with the damage to the inside of *376 both her upper and lower lips and to her right cheek, is evidence that two separate though interrelated forces were applied to her body. The primary force, most likely, was caused by the placement of the left arm “around the neck from behind with the crook of the elbow towards the front of the neck with considerable pressure ... causing obstruction, perhaps collapse, of the trachea ... or closure of the jugular veins ... and quite possibly also the carotid arteries.” Major Fossum opined that quite likely both of these forces (the hand over the mouth and the left arm around the neck) occurred at the same time. The damage to Emily’s inner mouth would require a moderate to severe amount of force. It would require fair to considerable pressure on the mouth to prevent a person from talking, but only slight pressure on the throat to do so.
Major Fossum further stated that a victim being smothered, if conscious and otherwise capable of normal response, would most likely struggle and attempt to disengage whatever is causing the asphyxia, perhaps causing injuries to an assailant. The most likely injuries to such an assailant would be scratching inflicted by the victim’s fingernails.
Major Fossum also informed the court that photographs taken of the appellant on 19 August 1982 revealed several superficial scratches or abrasions on appellant’s left arm, chest, and neck areas. (Slides 1 through 8, Prosecution Exhibit 7). The scratches on appellant’s left arm are consistent with a defensive wound inflicted by Emily’s fingernails.
Major Fossum opined that the manner in which the assailant grabbed Emily would normally result in loss of consciousness within 30 to 45 seconds or perhaps as early as 15 seconds. If Emily were struggling very hard, however, causing the assailant’s grip to loosen occasionally, the period prior to loss of consciousness could have been prolonged. The relatively small number of petechial hemorrhages on Emily’s body tends to indicate that a very brief struggle occurred before loss of consciousness. While normally it would take approximately four or more minutes of pressure for death to occur due to the constriction of a victim’s air supply, the heart can stop within 20 seconds if the blood supply to the brain is cut off. Emily had a relatively minor degree of impairment of blood vessels of the heart. Normally this would be of no medical significance, but in view of the circumstances described above, the rapid reduction in her blood flow may have created a conduction defect which greatly increased the likelihood of a fatal arrhythmia. The likelihood of cardiac arrhythmia would also be increased if Emily were in a highly emotional state at the time of the incident. There is no way to determine when cardiac arrest, which occurs in all deaths, occurred. Physical signs on the body, such as hemorrhaging and pulmonary edema, indicate that a certain amount of time passed during which Emily was in appellant’s grasp. It is unlikely that this was a “grab, die type time frame.” The large bruise on the top, left center of Emily’s head was caused by some “blunt instrument.” The nature and location of this bruise make it very unlikely that it occurred in a fall because it is consistent only with a headlong movement into something. The bruise could, however, have been caused by the chin of a taller person who was holding Emily with his hand on her mouth and his arm around her neck.
II. RESOLUTION OF CERTAIN CONTROVERTED FACTS
In clarification of certain controverted facts, this Court makes the following factual findings pursuant to our statutory authority. Article 66, UCMJ, 10 U.S.C. § 866 (1982).
The appellant and his wife were experiencing marital difficulties. The accused wanted a divorce, although his wife still loved him.
The appellant killed his wife before he returned to the home of Sergeant and Mrs. Worth. The cause of death was asphyxia due to suffocation. He subsequently departed the Worths’ home and went to the *377 military police station. At both places he attempted to establish an alibi.
Before Emily’s death, appellant pushed her to the ground because she was insulting him and his family. He knew she hit the pavement of the street fairly hard. The top of Emily’s head was not bruised in this fall. Emily continued to insult the appellant.
Appellant grabbed Emily, placing his left arm around her throat and his right arm over her face and nose. Appellant constricted Emily’s air supply by this hold.
Emily struggled hard to break appellant’s hold and to get oxygen into her lungs. Appellant exerted great pressure on Emily’s mouth and nose and around her neck, thereby preventing Emily from breaking loose.
Emily repeatedly scratched appellant’s left arm during this struggle and additionally scratched her own nose in an attempt to pull appellant’s hand from her face.
Appellant placed his chin on the top of Emily’s head to help him resist her struggling and, thus, bruised the top of her head.
Emily broke at least one fingernail while defensively scratching at appellant during this struggle.
Appellant was aware that he was cutting off Emily’s air supply during the struggle and he intended to do so.
Appellant continued his hold on Emily for an indeterminate period of time after she became unconscious.
III. SUFFICIENCY OF THE EVIDENCE
Appellant asserts that the evidence is insufficient to support appellant’s conviction of unpremeditated murder. We disagree.
Taken as a whole, the testimony of Major Fossum, the autopsy report, the photographs at Prosecution Exhibit 7, and the admission of the accused at Prosecution Exhibit 2 prove beyond a reasonable doubt that Emily Sue Stark is dead, that she died at the time and place alleged, and that her death, medically caused as described by Major Fossum, resulted from the act of the accused in grabbing her by the neck, mouth, and nose in a manner which constricted her air supply.
The killing of Emily Stark was unlawful, as it was done without legal justification or excuse. It is accepted as true that prior to her death she insulted appellant and his family. The accused, by his own admission, became uncontrollably angry and grabbed her. It is also accepted as true that this killing was done in the heat of sudden passion and was not (and was not alleged to be) premeditated. However, this fact does not suffice to reduce appellant’s criminal culpability. In order to reduce a charge of unpremeditated murder to a lesser offense, heat of passion must be accompanied by adequate provocation. United States v. Maxie, 23 C.M.R. 942, 951 (A.F.B.R. 1957), aff'd, 25 C.M.R. 418 (C.M.A. 1958). Although heat of passion is a subjective determination, adequate provocation is an objective concept. United States v. Seeloff, 15 M.J. 978 (A.C.M.R. 1983). It has been long and consistently recognized in military law, and rightfully so, that insulting, abusive, teasing, or taunting remarks, standing alone, do not constitute an adequate provocation to reduce murder to voluntary manslaughter. United States v. Seeloff, supra; United States v. Maxie, supra; United States v. Edwards, 11 C. M.R. 350 (A.B.R. 1953). Thus, we find that appellant’s heat of passion was not produced by adequate provocation and that appellant cannot, therefore, rely on Emily’s verbal conduct as an excuse for his actions.
We further find that, at the time of the killing, the accused had the intent to kill or inflict great bodily harm upon Emily Stark. The intent to kill or inflict great bodily harm can be proved by circumstantial evidence. United States v. Barnes, 15 M.J. 121, 123 (C.M.A. 1983). See also United States v. Leonard, 41 C.M.R. 353 (C.M.A. 1970); United States v. Aragon, 1 M.J. 662, 665-66 (N.C.M.R. 1975); United States v. Burke, 28 C.M.R. 604 (A.B.R. *378 1959). “It may be inferred that a person intends the natural and probable consequences of an act purposely done by him.” Paragraph 197c, Manual, for Courts-Martial, United States, 1969 (Revised edition) [hereinafter cited as MCM, 1969],
We are mindful that appellant has never acknowledged an intent either to kill his wife or to do her great bodily harm. The evidence adduced at trial, however, was extensive and included an autopsy report, expert medical testimony regarding the cause of and physical circumstances surrounding the victim’s death, psychiatric testimony as to the appellant’s state of mind at the time of his wife’s death, the appellant’s self-serving, sworn statement regarding the circumstances surrounding the death, photographic evidence of the conditions of both the victim’s body and the appellant’s body within a few hours of the incident, and the testimony of other witnesses to whom appellant made relevant comments either concerning his relationship with his wife or regarding the circumstances surrounding her departure that evening from the Worths’ residence. This evidence concerning accused’s state of mind, although circumstantial, proves beyond a reasonable doubt that appellant had the requisite criminal intent when he killed Emily Stark. The accused had a reason to rid himself of his wife (he wanted a divorce) and he was provided the opportunity to do so permanently when his wife provoked him to violence on a deserted road. Based on the competent evidence of record, this Court finds that there exists no reasonable doubt regarding appellant’s intent at the time of this incident. The manner in which he grabbed his victim — simultaneously around the throat and by the mouth and neck — is consistent with an intent to kill or to inflict great bodily injury. Further, the degree of force he used against a struggling victim and his disregard for her obvious resistance are not consistent with an intent merely to stop the victim from talking, but rather are consistent with and indicative of an intent to kill or to do great bodily harm. Moreover, the accused’s consciousness of guilt is reflected in his subsequent attempts to establish an alibi at the Worths’ home and at the military police station. The triers of fact heard the witnesses, reviewed the admitted documents, and evaluated the weight to be given each. Like the court members, we are convinced beyond a reasonable doubt of the appellant’s guilt. We therefore find this assignment of error to be without merit.
IV. ADMISSIBILITY OF APPELLANT’S PRETRIAL STATEMENT
Appellant asserts that the military judge committed prejudicial error by admitting Prosecution Exhibit 2, a pretrial inculpatory statement rendered by the appellant on 20 August 1982. Appellant argues that this statement was involuntary as a matter of law because it was the result of appellant’s unlawful detention and was obtained in violation of his right to remain silent. We find this argument to be without merit.
We find that appellant was properly advised of his right to remain silent in accordance with Article 31, UCMJ, 10 U.S.C. § 831, and of his rights to counsel pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966), and United States v. Tempia, 37 C.M.R. 249 (C.M.A. 1967). He was timely warned of these rights at least twice, first on the morning of 19 August 1982 and again on the morning of 20 August 1982. He knowingly, intelligently, voluntarily, and affirmatively waived these rights on each occasion and he did not thereafter attempt to withdraw these waivers.
We find that appellant was not unlawfully detained by law enforcement agents at any time during interrogation and that appellant’s statement, Prosecution Exhibit 2, was the product of neither coercion, duress, undue influence, nor unlawful inducement, but was, rather, freely given and voluntarily made.
We find that appellant’s request on 19 August 1982 that the CID “book him or let him go” was ambiguous as to his desire to *379 invoke his rights to silence. We recognize the duty of law enforcement personnel to scrupulously honor a suspect’s right to halt interrogation. Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); United States v. Muldoon, 10 M.J. 254 (C.M.A. 1981); United States v. Hill, 5 M.J. 114 (C.M.A. 1978). Assuming, arguendo, that appellant’s ambiguous demand was sufficient to alert criminal investigators that he desired to exercise his rights in some manner, we find that the agents responded correctly. Following appellant’s remark, they voluntarily ceased interrogating the appellant regarding Emily’s death. Criminal investigators are not mind readers; when a suspect makes an ambiguous statement regarding his rights, interrogators may ask reasonable questions in order to ascertain exactly what rights, if any, the suspect wishes to assert. Assuming, without deciding, that the CID initiated such administrative questions in this case, we find that such inquiry was not prohibited and did not constitute a continuation of the criminal interrogation process.
We find that when the accused directed the interrogators to “book him or let him go,” he was not requesting a permanent termination of interrogation. In any event, we find that appellant knowingly, intelligently, and voluntarily consented to return the next day to the CID office for further interrogation.
We find that the appellant returned voluntarily to the CID office on 20 August 1982 and that he submitted to further interrogation after again knowingly, intelligently, voluntarily, and affirmatively waiving his Article 31 and Miranda/Tempia rights.
We find that the appellant’s request to speak to the McBrides did not constitute an assertion of any right provided by Article 31, Miranda/Tempia, or any other constitutionally, statutorily, or judicially created rule of law. A suspect does not have the right to consult with friends or relatives prior to criminal interrogation; he has the right to consult with legal counsel. The record reflects that the McBrides were friends of the accused, not lawyers. Thus, the CID could have denied his request to see them.
We further find that the McBrides were neither agents nor employees of the CID and that they neither assisted the CID in the interrogation of the accused nor in any manner acted on behalf of the government during their visit with the appellant at the CID office.
We find that the military judge did not breach his discretion in making findings of fact concerning the defense’s suppression motion, and we find those facts to be true and accurate.
Finally, while it is true that “[t]he government must prove the voluntariness of a confession by a preponderance of the evidence,” and that “[ejvidence of psychological coercion is to be considered among the totality of the circumstances involved in determining whether a statement is voluntary under the fifth amendment,” United States v. Veach, CM 441900 (A.C.M.R. 24 Aug. 1982) (unpub.); see also Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); United States v. Collier, 1 M.J. 358, 366-67 (C.M.A. 1976), the Court finds that the government met its burden of proving that the appellant’s inculpatory statement (Prosecution Exhibit 2) was voluntary. See Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). Consequently, we conclude that the appellant’s statement was properly admitted into evidence.
Y. ALLEGED PRETRIAL ADVICE DEFICIENCIES
The appellant asserts that the military judge erred by denying the appellant’s motion for a new pretrial advice. We disagree.
With respect to the appellant’s request for a new pretrial advice, we note that “[t]he test for materiality is whether there is a fair risk the omission of fact would mislead the convening authority in his prosecutorial decision to determine the appropriate level of court-martial or what charges should be referred.” United *380 States v. Clements, 12 M.J. 842, 845 (A.C.M.R. 1982), pet. denied, 13 M.J. 232 (C.M.A. 1982). Even had the pretrial advice been accurate in every detail, we find the appropriate level of referral in this case to have been a general court-martial. The minor irregularities in the instant pretrial advice neither misled the convening authority nor caused him inappropriately to refer this case to a general court-martial.[2] Consequently, we find this assignment of error to be without merit.
VI. VIDEO TAPES OF PSYCHIATRIST’S INTERVIEW OF APPELLANT
Appellant asserts that the military judge erred by refusing to admit into evidence video tapes of the interviews of appellant conducted by his civilian psychiatrist, Dr. Rollins.
Defense sought the admission of these tapes prior to findings. These interviews included a period during which the appellant was under hypnosis. The military judge denied admission of these tapes because he did not find it essential that the court receive into evidence all research and investigative results which formed the basis for Dr. Rollins’ expert opinion in order to evaluate the weight to be given that testimony. The defense asserted that this evidence should be admitted because its probative value substantially outweighed any possible prejudice inherent in its admission. Mil.R.Evid. 403. We find the military judge’s decision to exclude this evidence consistent with Mil.R.Evid. 403 and 703.
With respect particularly to the portion of the interview during which the appellant was under hypnosis, it should be noted that these portions were not per se inadmissible. See State v. Nims, 180 Conn. 589, 430 A.2d 1306 (1980); People v. Blair, 25 Cal.3d 640, 159 Cal.Rptr. 818, 833 fn. 24, 602 P.2d 738, 753 fn. 24 (1979). We find, however, that there was substantial basis for the military judge’s decision to exclude this evidence. See State v. Harris, 241 Or. 224, 405 P.2d 492, 499-500 (1965) (video-taped statements of the defendant while under hypnosis excluded from evidence due to potential for confusion and because court members would likely be unable to consider the tapes for purposes other than the truth of the statements contained therein). Exclusion of this evidence does not, therefore, constitute an abuse of discretion. See State v. Harris, supra; People v. Modesto, 59 Cal.2d 722, 31 Cal.Rptr. 225, 382 P.2d 33, 382 P.2d 33, 39-40 (1963). We find similarly as to those portions of the videotapes during which the appellant was not under hypnosis.
Admitting evidence tending to show the accused’s consciousness of guilt is an accepted principle of military jurisprudence____ However, balancing the probative value of such evidence against its prejudicial effect is a task for the trial judge, and unless there is a showing of abuse, his discretion will not be overturned.
United States v. Borland, 12 M.J. 855, 857 (A.F.C.M.R. 1981). Accord United States v. Woodyard, 16 M.J. 715, 718 (A.F.C.M.R. 1983); United States v. Barus, 16 M.J. 624, 626 (A.F.C.M.R. 1983); see also United States v. Henry, 1 M.J. 533, 535 (A.F.C. M.R. 1975). We find no such abuse in this case and we find that the military judge exercised sound discretion in the procedure he utilized in disposing of this issue.
VII. PRETRIAL CONFINEMENT SENTENCING INSTRUCTION
Appellant asserts that the military judge erred by failing to instruct the court members that, in adjudging an appropriate sentence, they should consider time spent *381 by the appellant in pretrial confinement. The Manual for Courts-Martial does not mandate such an instruction. It does, however, state that tailored instructions should inform court members that they “may consider all matters in extenuation and mitigation____” Paragraph 766(1), MCM, 1969. In United States v. Davidson, 14 M.J. 81, 86 (C.M.A. 1982), it was held that the military judge must “particularly delineate” factors such as pretrial confinement in the sentencing instructions to court members. However, the Davidson case occurred at a time when a convicted servicemember’s sentence to confinement was not automatically credited for time served in pretrial confinement either judicially or administratively. Such is not now the case. In United States v. Allen, 17 M.J. 126,128 (C.M.A. 1984), the Court of Military Appeals held that Department of Defense Instruction 1325.4 “voluntarily incorporated] the pretrial-sentence credit extended to other Justice Department convicts.” This ruling applied “retroactively to cases under review as to sentences to confinement still being served.” 17 M.J. at 128. The Department of Defense did not modify the operative language of its Instruction following this decision. The Army immediately implemented a policy requiring that confinement facilities administratively credit the sentences of prisoners (including those whose cases were no longer undergoing review) with one day for each day of pretrial confinement served. Appellant clearly is within the category of prisoners entitled to such credit.
An instruction which would merely advise the court to consider as a matter in mitigation time spent in pretrial confinement, without also advising the court of the Army’s administrative pretrial confinement credit procedure, would be misleading. The military judge normally should give sentencing instructions tailored to advise the court of any pretrial restraint imposed upon the accused. United States v. Davidson, supra. However, he equally is obligated not to misadvise or mislead the court. Since Allen, supra, the nature of appropriate pretrial confinement sentencing instructions has changed. As stated by Chief Judge Everett: “[I]n instructing court members, a military judge can specifically advise them how pretrial confinement is treated for sentencing purposes.” Id. at 130 (Everett, C.J., concurring) (emphasis added). Thus, since Allen, a proper sentencing instruction also should inform the court of the administrative credit to be given the accused for time spent in pretrial confinement[3] in order to avoid the windfall which may accrue to the accused due to the actions of a misinformed court.
Considering the circumstances of this case, we find that the failure of the military judge to give a tailored pretrial confinement instruction was not plain error and that the issue was waived by defense counsel’s failure to make a timely objection to the military judge’s instructions at trial. Assuming, arguendo, that waiver is inapplicable in this case (although since Allen, supra, the effect of pretrial confinement on an accused’s sentence is quite different than it was when the Court rendered its decision in Davidson, supra), we nonetheless find beyond a reasonable doubt that in view of the nature of accused’s crime and the administrative credit to which he is entitled for pretrial confinement served, *382 any error which may have resulted from the judge’s failure to give a tailored pretrial confinement instruction is harmless.
VIII. SENTENCE APPROPRIATENESS
We find that considering the entire record the appellant’s approved sentence is not inappropriate. Accordingly, the sentence will not be reassessed.
We have considered the other issues personally raised by appellant and briefed by his counsel and find them to be without merit.
The findings of guilty and the sentence are affirmed.
Chief Judge SUTER and Judge COHEN concur.

. Petechial hemorrhages are tiny purple spots on the skin caused by ruptured blood vessels.

. We note that effective 1 August 1984, pursuant to R.C.M. 406(b), the pretrial advice need no longer contain a summary of the evidence. The discussion of that rule, which constitutes persuasive secondary authority, suggests that a summarized discussion of the evidence may be included when appropriate. Failure to include such information will not, however, constitute error. In light of the new rules for courts-martial, assignments of error such as this should soon be eliminated.

. While various forms of instructions regarding pretrial confinement will suffice, an example of an acceptable instruction would be:
In selecting a sentence, you should consider all matters in extenuation and mitigation (as well as those in aggravation,) (whether introduced before or after the findings). (All the evidence admitted in this case is relevant on the subject of sentencing.) Consequently, you should consider evidence admitted as to: ____ In determining an appropriate sentence in this case, you should consider the fact that the accused has spent_days in pretrial confinement. In this connection, you should consider the fact that if you adjudge confinement at hard labor as part of your sentence, the _ days (he) (she) spent in pretrial confinement will be credited against any sentence to confinement you adjudge. This credit will be given by the authorities at the correctional facility where the accused is sent to serve confinement and will be given on a day-for-day basis.