UNITED STATES, Appellee,

v.

Private (E–2) Jeffrey A. THOMAS, 218–84–7743, United States Army, Appellant.

SPCM 21441.

U.S. Army Court of Military Review.

26 Feb. 1986.

For Appellant: Lieutenant Colonel Arthur L. Hunt, JAGC, Major Marion E. Winter, JAGC, Captain Carolyn E. Washington, JAGC (on brief).

For Appellee: Colonel James Kucera, JAGC, Lieutenant Colonel Adrian J. Gravelle, JAGC, Lieutenant Colonel Gary F. Roberson, JAGC, Captain Erik M. Stumpfel, JAGC (on brief).

Before RABY, CARMICHAEL, and ROBBLEE, Appellate Military Judges.

## OPINION OF THE COURT

RABY, Senior Judge:

Appellant was convicted of wrongful appropriation and unlawful entry in violation of Articles 121 and 134, Uniform Code of Military Justice [hereinafter cited as UCMJ], 10 U.S.C. §§ 921 and 934 (1982). He was sentenced to a bad-conduct discharge.

Appellant asserts that the military judge erred in admitting in evidence appellant's statement to a Criminal Investigation Command (CID) Agent because it was obtained in violation of appellant's Fourth Amendment rights; that is, the statement is alleged to have been obtained as a result of an investigative detention or apprehension made without probable cause.

## I. The Relevant Facts

On or about 3 or 4 November 1984, property belonging to Sergeant Flanagan was stolen from his locked room. No visible signs existed indicating that the door of the room had been subjected to tampering. On 5 November 1984, First Sergeant (1SG) Van Buren discovered that the building master key was missing from his desk. First Sergeant Van Buren last remembered seeing the key in his desk at about 1100 hours on Friday, 2 November 1984. Although he did not observe appellant in the vicinity of the orderly room after he saw the key, 1SG Van Buren suspected that appellant, who had been working during the week in the orderly room, might have taken the master key.

On 6 November 1984, the unit commander notified the CID of the theft of SGT Flanagan's property. The CID then contacted another officer from the unit who informed them that 1SG Van Buren suspected appellant of the theft of the master key.

On 7 November 1984, the CID contacted Lieutenant Daum and scheduled four members of the unit, in sequence, for interviews the next day. This request was transmitted to 1SG Van Buren, because he and appellant had been among the four soldiers scheduled.

On 8 November 1984, 1SG Van Buren was interviewed by the CID.[1] He confirmed that appellant had been working throughout the week in the unit orderly room, and informed the CID that appellant had access to the missing key as did other persons who worked in the area.

Appellant's appointment with the CID was scheduled for 1030 hours on 8 November 1984. First Sergeant Van Buren directed Acting First Sergeant Lockimey to find appellant and to ensure that he arrived at the CID office on time. Sergeant Lockimey told Staff Sergeant (SSG) Vergason to

---

1. The CID report of investigation contained in the allied papers reflects that, on 4 November 1984, Specialist Five (SP5) Taylor (a soldier to whom the victim had entrusted his room key) was interviewed as a suspect and his room searched—all without producing any evidence of criminal wrongdoing on SP5 Taylor's part. The only other person subsequently interviewed as a suspect was appellant who was interviewed on 8 November 1984.

pick up appellant and escort him to the CID office because appellant's on-post driving privileges had been suspended. Staff Sergeant Vergason believed that he had received an order from the acting first sergeant to transport appellant to the CID office. Appellant neither was told that he was under apprehension nor was he placed in handirons. Staff Sergeant Vergason, however, did inform appellant that he was taking appellant to the CID office, and appellant believed that he had been ordered to go there by SSG Vergason. Appellant was taken directly to the CID office; he was not allowed to stop and talk with his wife. After SSG Vergason escorted appellant to the CID office, the CID informed Vergason that he could leave.

From the beginning of the interview, the CID processed appellant as a suspect. Appellant was advised of his *Article 31/Tempia*[2] rights which he waived. At no time was appellant informed by anyone from his unit or from the CID that he was free at anytime to leave the CID office. Appellant remained at the CID office for about five hours. Appellant initially made an oral statement denying his criminality. However, when he was asked to sign a written version of the exculpatory statement, appellant declined and informed the CID that "the statement was not true, that he had taken the property." Appellant told CID Special Agent (SA) Jarman that he was willing to sign a new statement which was then prepared. Special Agent Jarman testified that, at some point between appellant's oral admission of criminality and the execution of his second written statement, appellant informed him that he had made a previous appointment that afternoon. Appellant then asked whether he could leave and "return later to complete the statement." Special Agent Jarman construed appellant's request neither as a request not to make a statement nor as a request to terminate the interview. Instead, he considered appellant as merely asking, as a matter of convenience, for time to resched-

ule the other appointment or to leave the interview site temporarily in order to resolve the matter. Because of his interpretation of appellant's request, SA Jarman informed the accused "[t]hat you're already here, you might as well stay to complete the statement."

Appellant testified that he requested to leave the CID office as soon as SA Jarman "started asking questions about the theft" or about five or ten minutes after appellant had waived his *Article 31/Tempia* rights. Appellant states that SA Jarman told him that he "couldn't go that I had to stay and answer some questions then he'd let me go." Appellant did not believe he was free to leave the CID office.

In response to questions by the military judge, SA Jarman acknowledged that the import of his response to appellant was that the latter was not free to leave at that particular time—for convenience, necessity, or anything else.

Appellant did not attempt to leave the CID office and thereafter signed the second statement.

## II. Special Findings

The military judge issued certain findings of fact and conclusions of law, in part, as follows:

(A) That appellant was one of a group of personnel requested to be made available to the CID to interview;

(B) That appellant was ordered to appear for the interview;

(C) That appellant was not placed under apprehension;

(D) That the response by SA Jarman to any request by appellant to leave and return later was not one which affected appellant's freedom to leave and, therefore, did not constitute a detention;

(E) That appellant did not protest being at the CID office;

---

**2.** Article 31, UCMJ, 10 U.S.C. § 831 (1982); *United States v. Tempia,* 37 C.M.R. 249 (C.M.A. 1967).

(F) That appellant's request to leave was ambiguous and was responded to in an ambiguous manner;

(G) That the CID had no probable cause to justify an investigative detention or custodial seizure of appellant;

(H) That there was no investigative detention or custodial seizure of appellant within the meaning of *Dunaway v. New York*, 422 [442] U.S. 200 [99 S.Ct. 2248, 60 L.Ed.2d 824] (1979), or *United States v. Schneider*, 14 M.J. 189 (C.M.A.1982).

We accept the military judge's findings at (A), (B), (C), (E), and (F). We will hereinafter examine the basis for and the conclusions reached by the military judge in (D), (G), and (H), above.

We also make the following additional findings of fact.

(I) When appellant was asked to sign his first written statement, he declined and informed SA Jarman that the statement was not true and that appellant had taken the property.

(J) After making the oral admission that he had taken the property, appellant informed SA Jarman that he was willing to make a new statement. However, at some point thereafter, but before the new statement was executed, appellant told SA Jarman that he had another appointment that afternoon.[3]

(K) Appellant then asked SA Jarman if he could "leave and return later to complete the statement," or words to that effect. Special Agent Jarman did not believe appellant was asking to leave in order to terminate the interview. He believed appellant was merely requesting an opportunity to resolve his appointment problem, and to leave temporarily, as a convenience, in order to take care of this problem.

(L) Special Agent Jarman requested that appellant stay and complete the statement. He did not expressly refuse to let appellant leave; however, his ambiguous reply, under the existing circumstances, caused appellant to believe that he was not free to leave the CID office at that time.

## III. Discussion

In *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), petitioner was taken into custody by the police who lacked the probable cause required for an arrest warrant. Although not informed that he was under arrest, petitioner would have been physically restrained if he had attempted to leave. Petitioner was driven to police headquarters, placed in an interrogation room and questioned by officers after being warned of his *Miranda*[4] rights; he waived counsel and eventually made statements and drew sketches that incriminated him in crimes of attempted robbery and felony murder. The United States Supreme Court [hereinafter referred to as the Supreme Court] noted that the Fourth Amendment requires that seizures of persons must be based on probable cause; and, that a "stop on [the] street and frisk for weapons"[5] is a *sui generis* intrusion "so substantially less intrusive" than arrests that the general rule requiring probable cause for Fourth Amendment "seizures" reasonably could be replaced by a balancing test. *Dunaway v. New York*, 442 U.S. at 208–209, 99 S.Ct. at 2254. In declining to apply a balancing test excep-

---

3. We find it significant that appellant was advised of his rights at 1044 hours, 8 November 1984, and claimed approximately five or ten minutes later that he became so concerned about an afternoon appointment that he asked permission to leave the CID office. We believe that appellant would be more likely to become so concerned about an afternoon appointment later in the day, and this knowledge of human nature assists us in finding SA Jarman's testimo-

ny, as to the time when appellant voiced these concerns, to be more plausible and worthy of belief.

4. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5. *See, e.g., Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

tion to the facts of *Dunaway*, the Supreme Court observed:

> In contrast to the brief and narrowly circumscribed intrusions involved in those cases, the detention of petitioner was in important respects indistinguishable from a traditional arrest. Petitioner was not questioned briefly where he was found. Instead, he was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room. He was never informed that he was "free to go"; indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody. The application of the Fourth Amendment's requirement of probable cause does not depend on whether an intrusion of this magnitude is termed an "arrest" under state law. The mere facts that petitioner was not told he was under arrest, was not "booked," and would not have had an arrest record if the interrogation had proved fruitless, while not insignificant for all purposes ... obviously do not make petitioner's seizure even roughly analogous to the narrowly defined intrusions involved in *Terry* and its progeny. Indeed, any "exception" that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are "reasonable" only if based on probable cause.

*Dunaway v. New York*, 442 U.S. at 212–213, 99 S.Ct. at 2256–2257. (Citation omitted).

In our view, if the case at bar had occurred in a civilian law enforcement environment, it would have been considered as an instance of Fourth Amendment "seizure" requiring probable cause.[6]

However, due to the vital role which a thoroughly-trained, properly-equipped, and well-disciplined military force has to preserve national security, and thereby to secure for our citizens the rights and values flowing from our Constitution, military necessity requires that the constitutional rights of members of our armed forces, in certain compelling circumstances, be given "a different application" than those of the civilian members of our society. *See Parker v. Levy*, 417 U.S. 733, 751, 758, 94 S.Ct. 2547, 2559, 2563, 41 L.Ed.2d 439 (1974); *Brown v. Glines*, 444 U.S. 348, 354, 100 S.Ct. 594, 599, 62 L.Ed.2d 540 (1980).

The "central importance of the probable-cause requirement" is to assure "the protection of a citizen's privacy afforded by the Fourth Amendment's guarantees." *Dunaway v. New York*, 442 U.S. at 213, 99 S.Ct. at 2257. It is readily apparent that members of the armed forces cannot and do not enjoy the same rights to privacy as do the civilian elements of our society. In fact, even in a volunteer Army environment, the rights to privacy of members of the armed forces are substantially diminished when compared to the right to privacy enjoyed by civilians,[7] and this is one major consideration which compels certain soldiers to return ultimately to civilian life.

Recognizing these differences, the United States Court of Military Appeals [here-

---

**6.** Appellant was not questioned briefly at his unit; he was lawfully ordered to report to the CID office; he was transported to the CID office in the car of a noncommissioned officer from his unit who had been directed to escort him there; he was prepared for interrogation and subjected to prolonged questioning; he was never expressly informed that he could leave; his request to leave to take care of an appointment was answered in an ambiguous manner; and, if he had attempted to leave without obtaining CID authorization, appellant, at a minimum, would have run the risk of being charged with violating the broad but lawful order to report to the CID.

**7.** For example, soldiers are subject to lawful unannounced inspections, orders to report for duty, periodic medical examinations, random urinalysis testing, bed-checks, revocation of pass privileges, and many other well-known conditions, which provide them and the general public with notice of the diminished right of privacy inherent in the military service. Thus, of necessity, soldiers have no reasonable right of expectation to the same high standards of privacy generally enjoyed by the members of our civilian community.

inafter referred to as Court of Military Appeals] has observed:

> There are obvious differences between the military and the civilian practices which prevent literal application of the *Dunaway* doctrine.... [I]n the military milieu, the focus has been on the protection accorded by Article 31, the Fifth Amendment equivalent, rather than on the nature of the infringement of the person's freedom of movement (Fourth Amendment).

*United States v. Schneider*, 14 M.J. 189, 192–193 (C.M.A.1982).

 Due to the unique nature of the armed forces, the *Dunaway* doctrine is not applicable to a situation when a soldier merely reports, albeit involuntarily, to a specified location, pursuant to a lawful order received from his superior. *See United States v. Sanford*, 12 M.J. 170, 173–174 (C.M.A.1981) ("A service member is simply not free to ignore the lawful commands of his superiors.... In view of this reality of military life, a service member could not reasonably conclude that such action alone constituted a seizure for law enforcement purposes."); *cf. United States v. Price*, 15 M.J. 628, 631 (N.M.C.M.R.1982) (Accused was not subjected to a *Dunaway*-type seizure when he and nine shipmates were "detailed by the command to appear at NIS [Naval Investigative Service] for interview."), *pet. denied*, 16 M.J. 156 (C.M.A. 1983). Furthermore, a service member's receipt of an order to report, even if to a law enforcement office or for law enforcement investigative purposes, does not, standing alone, cause a Fourth Amendment "seizure" to occur and trigger the *Dunaway* doctrine. *United States v. Hardison*, 17 M.J. 701, 705 (N.M.C.M.R.1983), *pet. denied*, 18 M.J. 446 (C.M.A.1984); *cf. United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

> As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

> * * * * * *

> Nor was it enough to establish a seizure that the person asking the questions was a law enforcement official.

*United States v. Mendenhall*, 446 U.S. at 554–555, 100 S.Ct. at 1877.

 Merely being ordered to report to the CID office does not equate to a "seizure" under the Fourth Amendment. Whether such a "seizure" has occurred in a military environment is best determined by applying the test established by the Supreme Court in *United States v. Mendenhall*, 446 U.S. at 553, 100 S.Ct. at 1876, as expressly and impliedly modified to conform to military use by the Court of Military Appeals in *United States v. Sanford*, 12 M.J. at 173. This test [hereinafter referred to as the *"Mendenhall/Sanford"* test] provides that a person is seized only when, by means of physical force or a show of authority, as viewed in the context of the military and its daily operations, his freedom of movement is restrained significantly beyond that point where other service members' freedom of movement can be circumscribed without constitutional infringement. It is only when this degree of restraint is imposed that there is any foundation whatsoever for invoking constitutional safeguards. *See United States v. Mendenhall*, 446 U.S. at 553, 100 S.Ct. at 1876.

 *United States v. Schneider*, 14 M.J. 189, further elaborates regarding when a "seizure" has occurred. *Schneider* suggests an *ad hoc* consideration of at least nine different factors in determining whether a police station interrogation constitutes custodial detention. (This is not an inclusive listing, however.) *See also United States v. Price*, 15 M.J. at 631. Compliance with an order to report is one of the factors to consider, under the totality of the circumstances, in determining whether a seizure has occurred. *United States v. Schneider*, 14 M.J. at 195. Moreover, after an accused has received an order to report, his mere failure to protest the terms of the order cannot be presumed to constitute a

consent to a Fourth Amendment "seizure", as such a failure, standing alone, may well be only an acquiescence to military authority. *Cf. United States v. Middleton*, 10 M.J. 123, 133 (C.M.A.1981) ("[F]or the Government to carry successfully its burden of proving that the 'consent' [to a search] was, in fact, freely and voluntarily given, it must show that there was more than mere acquiescence to a claim of lawful authority.").

In the case at bar, appellant was not subjected to any physical force. In order to determine whether appellant was subjected to, and thus was "seized", within the meaning of the *"Mendenhall/Sanford"* test, we will consider what happened to the appellant during two distinct time periods. First, we will examine the period commencing with the time that appellant was ordered to report to the CID office through the time when appellant made the oral admission that his first written statement was false and that he had stolen the property in question. Second, we will consider the period following this oral admission and continuing until appellant was released from the CID office.

■ We find the following factors are relevant as to the first time period:

(A) Appellant was given a lawful order to report to the CID office;

(B) It was his military duty to obey this order;

(C) Appellant was transported to the CID office by an NCO escort, but he was not placed under apprehension;

(D) Appellant was not placed in handirons, threatened, or otherwise unlawfully coerced into obeying the order;

(E) Appellant did not protest the order, but this omission constituted only a showing of acquiescence to military authority;

(F) Appellant did not expressly consent to go to the CID office;

(G) Appellant was among several people from his unit who were scheduled for a CID interview.

(H) No probable cause existed to apprehend appellant or to place him in an investigative detention (custodial seizure) status when he initially reported to the CID office.

(I) Appellant was interviewed as a "suspect";

(J) Appellant was properly advised of his *Article 31/Tempia* rights, and was specifically advised that "If I am now willing to discuss the offense(s) under investigation, with or without a lawyer present, I have a right to stop answering questions at any time, or speak privately with a lawyer before answering further, even if I sign the waiver below.";

(K) Appellant was not expressly told that he could leave the CID office at anytime;

(L) At no time during this period did appellant seek clarification of his status, request an attorney, decline to make a statement, or attempt to obtain permission to leave.

Considering the totality of the existing circumstances, and in particular the above factors, we conclude that at no time during this first time period was appellant subjected to any show of authority which restrained his freedom of movement, when viewed within the context of the military and its daily operations, to a point of constitutional infringement. Therefore, we conclude that the *Dunaway* doctrine does not apply to this time period, and that appellant's oral admission of criminality was not obtained in violation of his Fourth Amendment rights.

■ Regarding the second time period, all of the factors listed in (A) through (K), above, except factor (H), apply. In addition:

(M) At no time during this second period did appellant expressly request to see an attorney, decline to make a statement, or ask that the interrogation be stopped permanently;

(N) Appellant sought clarification of his interrogation status by asking SA

Jarman if he could temporarily depart the CID office and return later to complete his statement;

(O) Special Agent Jarman did not understand the nature of appellant's request because it was ambiguously worded;

(P) Special Agent Jarman did not attempt to resolve this ambiguity by asking any meaningful follow-up questions; [8]

(Q) Special Agent Jarman gave appellant an ambiguous reply to his request for status clarification;

(R) After receiving SA Jarman's reply, appellant erroneously believed he was not free to leave the CID office.

Considering all of the above factors, we believe that at the moment SA Jarman gave appellant an ambiguous reply to appellant's request for status clarification that appellant was unwittingly subjected to a show of authority which restrained his freedom of movement. We believe this occurred because appellant originally had been given a lawful order, without further clarification as to its scope, to report to the CID; that upon arriving at the CID, appellant was not expressly informed that he was free to leave; and, that upon appellant's first attempt to obtain a clarification of his interrogation status, he was given an ambiguous reply. Because of these circumstances, we believe that appellant reasonably concluded, as his testimony indicated, that he was not free to leave the CID office. It is at this point and not before that, when viewed in the context of the military and its daily operations, appellant reasonably was subjected to a show of authority within the meaning of the *"Mendenhall/Sanford"* test. Thus, it is also at this point [9] that appellant was subjected to a Fourth Amendment "seizure"; at this point he was in an investigative detention status.

In view of the above circumstances, we conclude that appellant's first written statement and his subsequent oral admission of criminality were admissible in evidence. We further conclude that when the accused uttered his oral admission of criminality he provided the CID with reasonable

---

**8.** In *United States v. Stark,* 19 M.J. 519, 525 (A.C.M.R.1984), *pet. granted,* 21 M.J. 84 (C.M.A. 1985), we observed:

Criminal investigators are not mind readers; when a suspect makes an ambiguous statement regarding his rights, interrogators may ask reasonable questions in order to ascertain exactly what rights, if any, the suspect wishes to assert.

In this instance, SA Jarman apparently tried either to take advantage of appellant's ambiguous request or to read appellant's mind, and because of this, gave appellant an ambiguous reply to appellant's question concerning his interrogation status.

**9.** We find that the following facts exist concerning the temporal sequence of events occurring at the CID office: Appellant arrived at the CID office at 1035 hours, 8 November 1984. Thereafter, DA Form 3881, Rights Warning Procedure/Waiver Certificate, was signed and the time of document's execution was handwritten and initialled by appellant. This document was executed at 1044 hours, 8 November 1984. DA Form 2823, Sworn Statement, was signed and the time of this document's execution also was handwritten and initialled by appellant. This document was executed at 1410 hours, 8 November 1984. Thus, we find that the total time lapse from the commencement of interrogation to the execution of appellant's second written statement was only 3 hours and 26 minutes. Appellant was released from the CID office at 1538 hours, 8 November 1984—a total of 5 hours and 3 minutes after his arrival at the CID office. The entire period of time during which SA Jarman prepared for appellant's interview, appellant was read and waived his *Article 31/Tempia* rights; appellant made oral statements denying his criminality; appellant's denial of criminality was reduced to writing; appellant made his decision not to sign the first statement; appellant made an oral admission of deception to SA Jarman; and appellant made an oral admission of criminality: all occurred before appellant was subjected to a Fourth Amendment "seizure". We are convinced that substantially more than one-half of the total interrogation time elapsed before appellant was subjected to detention for custodial interrogation. Thus, appellant was in a detention for custody status for less than 1 hour and 43 minutes before he actually executed his second statement and for a much shorter period of time before he began to provide SA Jarman with the specific facts which were ultimately included therein.

grounds to believe that he had committed an offense under the Uniform Code of Military Justice. Accordingly, we find that the second written statement, which was taken after appellant had been subjected to a Fourth Amendment "seizure" (detention for custodial interrogation), was based on "probable cause" within the meaning of *Dunaway,* and that it too was admissible in evidence against appellant.

The findings of guilty and the sentence are affirmed.[10]

Judge CARMICHAEL and Judge ROBBLEE concur.

**10.** This case did not involve a situation in which a service member was directed to report to his *commander* for questioning. We believe a service member enjoys a somewhat greater expectation of privacy in a military law enforcement office setting than when he is summoned by his commander for questioning.